UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
Southern Division

| | | |
|---|---|---|
| JOHN DOE | * | |
| Plaintiff | * | |
| vs. | * | |
| WALLACE LOH, LINDA CLEMENT, | * | |
| CATHERINE A. CARROLL, | | |
| JOSH BRONSON, and ANDREA GOODWIN, | * | Case No. 16-cv-03314 PX |
| Individually, and in their | | |
| capacity as employees of the University of | * | |
| Maryland, College Park, jointly and severally | | |
| | * | |
| and | | |
| | * | |
| THE BOARD OF REGENTS OF THE | | |
| UNIVERSITY SYSTEM OF MARYLAND | * | |
| Defendants | * | |

## AMENDED COMPLAINT

JOHN DOE[1], a former student of the University of Maryland, Plaintiff, sues Wallace

Loh, President of the University of Maryland, College Park ("UMCP"), Linda Clement, Vice

President for Student Affairs, UMCP, Catherine A. Carroll, Director, Office of Civil Rights &

Sexual Misconduct (hereinafter "OCRSM"), UMCP, Josh Bronson, Assistant Director, OCRSM,

UMCP, and Andrea Goodwin, Director, Office of Student Conduct, UMCP, Defendants, both

individually, and in their capacity of employees/officials of the University of Maryland, College

Park.

## JURISDICTION AND VENUE

---

[1]"John Doe" or "J.D." is a pseudonym to protect the identity of the Plaintiff in these
sensitive proceedings concerning allegations of sexual misconduct.  During the course of this
complaint, the Plaintiff's accuser will be referred to as "Jane Roe" or "J.R." to also protect her
identity insofar as she alleged that she was the victim of sexual misconduct.

1.  At all times relevant to the Complaint, the Plaintiff was a resident of the State of Maryland .

2.  At all times relevant to the Complaint, the individual Defendants were employees of the University of Maryland, College Park, an instrumentality of the State of Maryland, located in College Park, Maryland. Upon information and belief, the individual Defendants are residents of the State of Maryland.  The Board of Regents of the University System of Maryland (hereinafter "Board of Regents") is the governing body of all of the constituent institutions of the University System of Maryland which includes the University of Maryland, College Park campus, and is empowered to be sued for actions against the University under the statutory law of the State of Maryland.  To the extent that liability is alleged against the Board of Regents, the Plaintiff will refer to the Defendant as UMCP (University of Maryland, College Park), the Board of Regents being the governing body of that institution.

3.  Jurisdiction exists in this court pursuant to 28 U.S.C. §1331 (Federal Question Jurisdiction).  Additionally, supplemental jurisdiction exists in this court pursuant to 28 U.S.C. § 1367 over state law claims that are so related to claims within the original jurisdiction of this court that they are form a part of the same case or controversy under Article III of the U.S. Constitution (Pendant Jurisdiction).

4.  Venue exists in this court pursuant to 28 U.S.C. §1391(b), in that the events that giving rise to the claims that are the subject of this action arose in the State of Maryland.

## FACTS COMMON TO ALL COUNTS

**The Incident**

5.  The Plaintiff, John Doe (hereinafter "J.D."), a Maryland resident, was a full-time student at the University of Maryland, College Park from 2011 until his expulsion, for alleged sexual misconduct, on September 30, 2015.  On December 14, 2014, the Plaintiff lived in on-campus housing provided by the UMCP while enrolled as a full time student.

6.  On or about midnight on December 14, 2014, the Plaintiff, went to a bar located in College Park, Maryland where he met Jane Roe (hereinafter "J.R.")[2] and several other friends.  After the bar closed at approximately 2:00 a.m., the Plaintiff, J.R., and their friends walked over to the on-campus apartment of another friend, K.P, in Frederick Hall.[3]

7.  At the apartment, J.D., J.R. and other residents of the dorm/apartment played video games for a period of time, until J.R. decided she needed to go to sleep.  She went into K.P.'s room in the apartment, lied down in his bed, and fell asleep.  At some point, K.P. also decided to go to bed and lied down in his bed next to J.R.  The Plaintiff, also tired, went to sleep on the couch in the living room of the apartment.  After some period of time, K.P. came out of the room with his blanket and pillow, stating that he was uncomfortable in the bed.  He suggested that the Plaintiff, J.D., who did not live in the apartment, should go and sleep in the bed with J.R., because K.P. wanted to sleep on the couch upon which J.D. was sleeping.  J.D. went into the bedroom, and lied down in the bed next to J.R.  J.D. fell asleep in the bed next to J.R.

---

[2] As pseudonym for the Plaintiff's accuser, used to protect her identity in this case.

[3] The friends and acquaintances of the Plaintiff and his accuser will be identified in this Complaint by their initials, to preserve the anonymity of the parties to the misconduct complaint

8.   After some period of time, J.D. and J.R. engaged in consensual sexual activity.  They began kissing each other, and J.D. began fondling J.R. under her clothes.  J.R. removed her blouse and bra and took off her pants with the assistance of J.D.  J.D. asked J.R. to perform felatio, to which request she obliged.  At some point during the encounter, J.R. looked at J.D., exclaimed, "You're not K.P."  J.D. immediately stopped the sexual activity and left the room.  J.R, appearing upset, left a few minutes later, and called the University of Maryland police, who responded to the location.

**The Police Investigation**

9.   At approximately 6:00 a.m. on December 14, 2014, the University of Maryland Police responded to a University of Maryland student housing apartment near the dormitory where the alleged incident occurred and interviewed J.R., who gave both an oral and written statement consistent with the allegations in Paragraph 8, above.  The written statement, although subsequently obtained by University of Maryland in its sexual misconduct investigation, was not and has not to this day been provided to the Plaintiff.  Later in the morning, at approximately 8:15 a.m., J.R. was interviewed again the University of Maryland Police. According to the police, J.R. gave the police the following statement, quoted here in pertinent part,

> At this time, J.R. asked K.P. if she could sleep in his bed for the night, and he granted consent. J.R. went in to K.P.'s bedroom (2107B), and was followed by K.P.. When J.R. and K.P. got into the bed, the bedroom door was closed, the lights in the bedroom were all off, and there was very minimal visibility inside of the room. J.R. entered the bed wearing her black pants, and spaghetti strapped shirt over her bra and underwear. J.R. had only removed her jacket and shoes before entering the bed. K.P. entered the bed wearing sweatpants and a t-shirt. Both, K.P. and J.R. went to sleep while K.P.'s roommates stayed in the common area of the apartment. J.R. slept on the side of the bed closest to the wall, with her body position facing the wall. The bed was up against the wall. K.P. slept in the bed positioned behind J.R.. While sleeping, K.P. and J.R. did not engage in any intimate contact. J.R. slept for approximately 2 hours, and awoke at

4

approximately 0500hrs to the suspect, Plaintiff, touching her stomach area. At this time, J.R. believed that the individual touching her was K.P. since he had gotten into the bed with her before she fell asleep. J.R. allowed the touching to continue, and allowed it to progress into Plainitff caressing her stomach, legs, and buttox while J.R. still had her clothes on. Plainitff then reached around J.R. with his left arm, and placed his left hand into her pants. Plainitff then performed digital penetration on J.R. for approximately 10-15 minutes. J.R. then allowed Plainitff to take off her pants before he proceeded to continue the digital penetration and kissing. At this time, J.R. could feel that Plainitff had removed his shirt and his pants. Plainitff then got on top of J.R. while she was in a supine position. Plainitff then placed his penis on J.R.'s face and repeatedly asked her to put it in her mouth. J.R. consensually allowed Plainitff to place his penis in her mouth. Plainitff placed his penis in and out of J.R.'s mouth approximately 3 times. At this time, J.R. could slightly see the outline of Plainitff's head and had heard his voice as he asked her to perform oral sex on him. Primarily due to the fact that she recognized the voice as Plainitff, and not K.P., she became upset and yelled "Get off of me", "You're not K.P.", and "You're not who I thought you were." Plainitff immediately stopped touching J.R. and got out of the bed. Plainitff put his clothes back on and exited the room.[4]

A complete report of the incident made by the University of Maryland Police, (hereinafter "the Police Report") as provided by to the Plaintiff in October, 2015, is attached as Exhibit 1[5].

[EXHIBITS 1-12, ATTACHED TO THE ORIGINAL COMPLAINT, ARE INCORPORATED BY REFERENCE IN THIS AMENDED COMPLAINT, AND ARE NOT BEING REFILED HERE AS EXHIBITS].

10.   The University of Maryland Police also interviewed other friends of the Plaintiff who slept in the apartment that night, including K.P. and A.S., another occupant of the apartment.  The police report of K.P appears at p. 8 of the report.  The report suggests that,

---

[4]The names of the participants have been changed from their actual names, as appeared in the report, to J.R., K.P., and Plaintiff, respectively.

[5]The copy of the police incident report obtained by the Plaintiff from the U of Md. Police does not include the written statement given by J.R. to the police, but does include the Plaintiff's written statement.  On information and belief, both statements were  made available to the sexual misconduct investigators, including Defendants Bronson, Carroll, and Martone.

according to K.P., the Plaintiff may have entered the room in which J.R. was sleeping on a dare, "to see how long it would take her to realize thath she was 'cuddling' with [J.D.] and not [K.P.]" The police report of A.S.'s statement appears at pp.7-8 of Exhibit 1, and is incorporated herein by reference.  According to the police account of A.S.'s statement,

> [A.S.] said that at some point [J.D.] brought up a dare for himself. [J.D.] had said that he would go into and play a joke on J.R.. [J.D.] said that he would go into the room and pretend to cuddle with [J.R.] until she turns around and realizes that she is not "cuddling" with [K.P.], but was actually "cuddling" with [J.D.]. After she recognized that it was [J.D.], she would send [J.D.] out of the room.

Additionally, according to the report, A.S. stated that when [J.D.] came out of the room, the Plaintiff stated that "[J.R.] had not realized that she was making out with [J.D.] instead of [K.P.] [J.D.] had said that he had thought that [J.R.] knew it was [J.D.] the entire time.

11.  The police interviewed the Plaintiff and obtained a written statement from him.  The Plaintiff provided a statement consistent with the allegations in Paragraph 8, above.  The Plaintiff denied having entered the room on a dare, stating that he only wanted to sleep.  The Plaintiff told the police that he thought that J.R. knew she was engaging in sexual activity with the Plaintiff because they had kissed face to face with open eyes and had spoken to each other during the encounter.

12.  Having interviewed all of the relevant parties, and having consulted the State's Attorney for Prince George's County, the police declined to bring criminal charges, concluding that the parties had engaged in consensual sexual activity, and that the Plaintiff stopped the activity immediately when J.R. withdrew her consent.  On January 27, 2015, the University of

Maryland Police turned over to the University of Maryland Office of Civil Rights and Sexual Misconduct issued the police report that purportedly included the written statement of J.R. made on December 14, 2014, the morning of the incident.  That report was made an attachment to their Investigative report issued in April, 2015.  However, Plaintiff did not receive a copy of that report until October, 2015, well after the investigation and the sexual misconduct investigation was concluded.  The written statement of J.R., referenced in the report, was not released to the Plaintiff.

**The Complaint and Investigation by the Office of Civil Rights and Sexual Misconduct**

13.  On December 15, 2014, J.R. filed a complaint with the University of Maryland Office of Sexual Misconduct and Relationship Violence, shortly thereafter renamed as the Office of Civil Rights and Sexual Misconduct ("OCRSM").  The director of that office at all times relevant to the Complaint, and currently, is the Defendant Catherine Carroll.  The Plaintiff was notified by email of the complaint on January 29, 2015, a copy of which is attached as Exhibit 2.  The Notice contained no factual information on the actual nature of the complaint; only that an incident of "sexual misconduct" occurred on December 14, 2014, at Frederick Hall.  The email also contained a copy of a "Notice of Rights and Responsibilities", attached as Exhibit 3. There were no attachments to the Notice.  Apparently, on the same day as J.R. filed her complaint, she met with Defendant Josh Bronson and gave a verbal statement regarding the incident.  Apparently that statement had significant differences from the version of the events that J.R. had given to the University of Maryland police the previous day.

14.  On February 13, 2015, the Plaintiff met with Defendant Josh Bronson, appointed by Defendant Carroll as the "Special Investigator" for the complaint, and Assistant Director of

OCRSM.  At the time of this meeting, Plaintiff had never received a copy from any officials of the University of Maryland 1) Notice of the Procedures and Policies under which he was being investigated; 2) any factual summary of alleged sexual misconduct; 3) any notice of what specific policy violations for which he was under investigation, nor was he furnished such information at the meeting, or a copy of the complaint made by J.R. against him, as was required by the relevant procedures.

15.  Notwithstanding the failure to properly advise Plaintiff of the complaint or the procedures applicable to same, Bronson begain an inquisition of the Plaintiff.  The interview was prosecutorial in nature; Bronson repeatedly challenged or attempted to contradict the version of events given by the Plaintiff.  Plaintiff gave to Bronson the contact information for his friends that were present in the apartment on the evening of the alleged misconduct.  The Plaintiff gave Bronson a statement consistent with his statement to the police: that all of the sexual contact was consensual between J.D. and J.R., and that J.D. believed that J.R. knew who he was because they faced each other, they spoke to each other, and also because J.D. had a beard, while T.P. was clean shaven.  J.D. denied that he entered the room on a dare; he allowed that his friends may have joked about him going into the bedroom, but J.D. wanted only to go to sleep.  During his interview and with subsequent interactions, Bronson described his role in the proceedings as a prosecutor.  No recording of the Plainitff's or J.R.'s interview with Bronson was made.  In the Investigation Report subsequently issued by Bronson, Bronson materially distorted and misrepresented the Plaintiff's version of events.  Upon information and belief, it is Bronson's standard practice to use what would normally be referred to as police or prosecutorial interview

tactics when interviewing respondents or witnesses friendly to respondents, while treating complainant's statements as true, without testing those allegations.

16.   Bronson never contacted the witnesses that the Plaintiff provided to Bronson on the date of the interview and who were named in the police report, although he claimed to have attempted to contact them in his investigative report[6] and in his subsequent testimony before the Standing Review Committee.  The investigative findings that Bronson, with the approval of Carroll and Goodwin, used to convict the Plaintiff never contained the first hand testimony of Plaintiff's witnesses, that would have contradicted the implications of their statements contained in the Police Report.

17.   On or about April 20, 2015, Bronson issued his "Final Investigation Report" a redacted copy  of which was later given to the Plaintiff, and that redacted copy is attached hereto as Exhibit 4[7]. On April 24, 2015, Plaintiff was given an opportunity to review the report and take notes on it, but was not allowed to make a copy of same.  He was allowed to submit comments to the report, which were included in the final version, which was later provided to Plaintiff in redacted form, without a copy of Exhibit A, the Police Report from the University of Maryland Police or the written statement of J.R. given to the police on December 14, 2015, which statement to this day the Plaintiff has never received or reviewed.

18.   In Bronson's report, at the outset, he states the following,

---

[6]Bronson stated, "On February 16 and March 2, of 2015 I attempted to contact via email and phone all three witnesses as identified in the police report. I was not successful in contacting any of the witnesses."  These witnesses later filed affidavits that they were never contacted by Bronson.

[7]The report provided to the Plaintiff contained redactions of all witness/parties except the Plaintiff.  Plaintiff has redacted the previously redacted report to omit references to him by name.

In my interview with [REDACTED][8] I utilized trauma informed investigation techniques based on national best practices  Based on my training and experience, the UMPD interview of [REDACTED] does not appear to have used these techniques. Further I am not aware of any specialized training UMPD has received with respect to conducting trauma informed interviews of sexual assault victims. This could account for the difference in our conclusions regarding [REDACTED]'s statements.

Bronson also credits the 2nd degree hearsay statements of witnesses, as related in the Police Report, the names of whom were also redacted in the report released to the Plaintiff, but whom the Plaintiff knew were present on the night of the incident, and who the Plaintiff knew, because they were his friends, that they had been interviewed by the police.

19.   Bronson's recitation of his interview with J.R. contained significant differences between what J.R. allegedly said to Bronson, and what J.R. said to the police.  According to Bronson, J.R., in the non-recorded interview of her on December 15, alleged as follows[9]:

[REDACTED] stated she woke up when she felt a hand go down her pants. [REDACTED] believed that this was *[REDACTED]*'s hand and did not stop him. [REDACTED] stated she was penetrated with the male's fingers and then the male pulled his pants down and put his penis in her mouth.  [REDACTED] stated she ten realized it was not [REDACTED], but [Plaintiff].  [REDACTED] stated she asked what he was doing and [Plaintiff] left the room.

[REDACTED] stated she woke up at approximately 5:00 AM, but she was not certain about the time, she thought was *[REDACTED]*'s arm on her waist, and his hand touching her stomach. [REDACTED] stated that she assumed it was *[REDACTED]* Given that [REDACTED] was asleep at the time his arm was placed on her waist, it was not consensual.

---

[8]"[REDACTED]" is quoted, because the only copy of the report that the Plaintiff received had such redactions, although from reading the report, it is evident that the redacted words identified J.R., the alleged victim.

[9]Plaintiff quotes only from the redacted report that he received, and includes the redactions.  However, it is apparent from reading the document that "[REDACTED] refers to J.R., and that *[REDACTED]* refers to K.P., the resident of the room where the sexual activity took place.

[REDACTED] continued that she woke up because *[REDACTED]*'s hand was touching her stomach. [REDACTED] stated she was facing the wall, with her back to *[REDACTED]*. The person she thought was *[REDACTED]* then used his hand and continued by touching her "butt" over her pants. [REDACTED] stated she thought *[REDACTED]* would stop touching her because she was not reacting and lay still. [REDACTED] also stated because she thought it was *[REDACTED]* and because they had not engaged in sexual contact before, that by lying still and not reacting, he would stop. [REDACTED] stated that this behavior occurred for approximately 3-5 minutes.

[REDACTED] continued that the person who she thought was *[REDACTED]*, then put his hand down her pants, touched the outside of her vagina, and then inserted his finger inside her vagina. [REDACTED] stated she then rolled over toward *[REDACTED]* with her eyes closed and that *[REDACTED]* was kissing" her on her mouth. [REDACTED] stated she was thinking about how much she didn't want any sexual activity; that she just wanted the behavior to end and that by going along with it, she thought it would end more quickly. [REDACTED] also stated she was still intoxicated, and had just woken up and didn't realize everything that was happening at the time.

[REDACTED] stated that the person whom she thought was *[REDACTED]* then tried to take her pants off, but didn't succeed, and instead took his pants off and climbed on top of her chest. [REDACTED] stated that he said, "Put it in your mouth," and as he said it, he slid his penis towards her mouth while straddling her, and put his penis into her mouth stated that she shook her head no as *[REDACTED]*'s penis was moving towards her mouth. [REDACTED] continued that she opened her eyes and saw that the person was not *[REDACTED]*. [REDACTED] stated the shirt was different than the one *[REDACTED]* had been wearing, and she immediately recognized [Plaintiff]. [REDACTED] stated she yelled, "What are you doing? You're not *[REDACTED]*! [REDACTED] stated [Plaintiff] then removed his penis from her mouth and got off of her.

Thus, in the police version of the events, J.R. describes consensual sexual activity between her and the person that she thought was K.P., including an act of fellatio, that went on for about 15 minutes. In the version of events contained in the Investigation Report as recounted by Bronson, J.R. describes essentially non-consensual activity in which she reluctantly acquiesced. The version recounted by Bronson makes no mention of the length of time that the sexual activity consumed.

**The Disciplinary Process**

20.   On May 5, 2015, Plaintiff received from Defendant Goodwin, Director of the University of Maryland Office of Student Conduct, and email with policy attachment, attached as Exhibit 5, advising the Plaintiff that he should appear at a meeting the next day for an "Outcome Conference" wherein he would be given a copy of the Final Investigative Report, and the opportunity "to share with you the outcome of the investigation, any resulting disciplinary charges, and discuss pertinent procedures for final resolution."  He was advised to review the University's Sexual Misconduct Policy and Code of Student Conduct (attached) prior to attending the meeting.  He was advised that he had the right to counsel and to consult the Undergraduate Student Legal Aid Office.  The Outcome Conference was set for the next day, May 6, 2016, at 2:00 p.m.  At the Outcome Conference, the procedures mandate that the respondent/plaintiff be advised as to whether he was being charged with a policy violation and the recommended sanctions.

21.   Appended to that email was a statement of the procedures that would be applicable: Policy VI-1.20(A), effective August 23, 2013.  That policy, at pp. 7-8, noted that complaints against students would be reviewed in accordance with the University's Code of Student Conduct, Policy V-1.00(B), which, according to the Policy, afforded certain rights,

> Under the University's Code of Student Conduct, both parties are given a number of important rights, including the right to pose questions to the other party, the right to be advised by an advisor of their own choice during any hearing or related meetings, the right to address the hearing board, the right to question witnesses and present evidence, the right to be informed of the outcome of the case, and the ability to appeal decisions made by the hearing board. The burden of proof is on the complainant, who must establish the responsibility of the student charged by a preponderance of the evidence standard (e.g., more likely than not). The proceedings shall be prompt, fair and impartial, and conducted by persons who receive annual training on sexual misconduct and how to conduct an investigation

12

and hearing process that protects the safety of victims and promotes
accountability.

A copy of the applicable Code of Student Conduct in effect at the time is attached as Exhibit 6.

22.   Plaintiff was unable to attend the scheduled Outcome Conference on such short

notice.  He sent Defendant Goodwin an email explaining his inability to attend.  A copy of the

email thread of the next 2 days is attached hereto as Exhibit 7.  On May 7, 2015, Plaintiff

received a "charging letter", attached as Exhibit 8, informing him that he was charged with

> Violation of the Code of Student Conduct, specifically: 1. Part 10, Section (q):
> Violation of published University regulations or policies, as approved and
> compiled by the Vice President for Student Affairs; specifically the Sexual
> Misconduct Policy: http://www.president.umd.edu/policies/2014-VI-160A.html.

A copy of that policy, as it was in effect at the time of the alleged misconduct, is attached has

Exhibit 9.  While it may not have been obvious to the Plaintiff, the charging letter advised the

Plaintiff that he was being sanctioned under a different policy, 2014-VI-160A, than the policy he

had been notified that he was being charged under not two days earlier, Policy VI-1.20(A).  The

policies contain different definitions for sexual assault, incapacity, and other relevant matters.

At the end of the charging letter, Exhibit 8, were two links to University policies, a link to "Code

of Student Conduct" and a link to "Sexual Misconduct Procedures."  A copy of "Appendix A",

which are the "Sexual Misconduct Procedures" applicable to students, is attached as Exhibit 10.

The charging letter, Exhibit 8, did not contain the recommendations of Goodwin, as the Director

of Student Conduct, as to the proposed sanction, so the Plaintiff was not on notice that Goodwin

was recommending that he be expelled from the University.

23.   A review of the two different policies reveals two completely different hearing

procedures.  Under the Code of Student Conduct, under which the Plaintiff was charged, and

advised, paragraphs 33-37, Plaintiff had the right to be represented by counsel that could participate at a hearing, testify in his own behalf, cross examine witnesses, make objections to testimony, etc.  The hearing procedure is essentially a mini-trial, with full due process rights. However, under the "Appendix A" procedures, no such rights were afforded.  The respondent was afforded no right to testify, obtain copies of the evidence, to testify, call witnesses, or cross examine witnesses against him.  Plaintiff was not given the opportunity to even review the conflicting statements made by J.R. contained in the Police Report and the Investigation Report prepared by Bronson.  Although Plaintiff was given conflicting advise by Defendant Goodwin as to the applicable procedures in his case, Plaintiff was not given a reasonable opportunity to obtain representation, in violation of his due process rights.

24.   After Plaintiff received the "charging letter" on May 7, 2015, Exhibit 8, he wrote Defendant Goodwin asking for time to obtain counsel for his appearance before the Standing Review Committee that was to be convened on May 13, 2015, six days hence, and just prior to final exams.  That email, attached as Exhibit 7, contains the following request from the Plaintiff,

> Hello Ms. Goodwin,
> Is it possible to postpone the standing trial as I have scheduled an appointment to meet with my student defender on Monday since their offices are closed on Friday. Also, is it possible to postpone the trial till after finals so I can concentrate wholly on my academics because this is an extremely difficult time for me to be managing both of these commitments. I can be called at [REDACTED] if you still need to talk to me about anything.

Defendant Goodwin responded as follows:

> Hi [J.D.],
> The Standing Review Committee Meeting **is not a hearing** (emphasis supplied) and there is no process for postponement. The Committee will meet with the investigator on Wednesday regardless of whether you attend. I am happy to answer more questions after your meeting with your student defender on Monday. Best,

14

Andrea

25.   Additionally, in those same emails to Goodwin, the Plaintiff complained of the bias

of Bronson in his conduct of the investigation, that Bronson saw his role as one of a prosecutor

to obtain a policy violation against the Plaintiff.  Plaintiff also notified Goodwin of his need to

bring both the police and the roommate witnesses to the hearing.  Goodwin failed to respond or

was intentionally and deliberately indifferent to the Plaintiff's claims of bias and to his request to

have witnesses subpoenaed to the hearing.

26.   On May 13, 2015, the Standing Review Committee convened.  The Plaintiff was not

allowed to make a statement, but was only allowed to answer questions directed to him from the

hearing panel.  When he attempted to make a statement, he was advised that he was only allowed

to talk about how the proceedings impacted him.  He was told that he pose questions to the

investigator, Defendant Bronson, but the complainant, Roe, was not available to have questions

asked of her.  Plaintiff was allowed, as a deviation from regular practice, to introduce statements

from the 3 witnesses mentioned in the redacted report, attached hereto as Exhibit 11.  Plaintiff

was allowed to tell the Committee how the proceedings impacted him.

27.   On May 20, 2015, the Standing Review Committee released its finding that the

Plaintiff violated the Sexual Misconduct Policy.  It assessed the credibility of witnesses that it

had never heard from in person, based on hearsay reports of their statements, as folows,

The Standing Review Committee found [J.D.] responsible for violating the
University's Sexual Misconduct Policy. The SRC did not find [J.D.'s] explanation
for entering the room to get some sleep credible and gave more weight to the
interviews conducted by the police of the occupants of the suite. These interviews
alluded to [J.D.] entering on a dare to get into bed with [J.R.] to essentially see
how long he could masquerade asp[K.P.] before [J.R.] realized he was not [K.P.],
the person she went to bed with hours before. While masquerading as [K.P.],
[J.D.] made no reasonable attempt to identify himself to [J.R.] who had no reason

15

to believe the person who began touching her was not the person she went to bed with.

It was recommended that the Plaintiff be expelled from the University.  A copy of the finding is attached as Exhibit 12.

28.  Plaintiff filed an appeal of the decision, attached as Exhibit 13.  The appeal procedures of the sexual misconduct policy contained in Appendix A do not allow for an appeal of the fact finding of the Standing Review Committee.  Upon information and belief, and as provided for by Appendix A, any decision to expel a student based on sexual misconduct had to be approved by the Vice President for Student Affairs, Defendant Linda Clement, and the President of the University, Defendant Wallace Low.  Plaintiff's appeal was denied, and on September 30, 2015, Plaintiff was informed by Defendant Keira Martone, Assistant Director of Resident Life, that he was expelled from the University, upon information and belief, with the approval of Defendants Clement and Loh. See Exhibit 14, attached.  Plaintiff subsequently wrote Defendant Loh about his expulsion, and was informed by Loh that he would not change the expulsion decision.

**The Due Process Violations**

29.  The disciplinary proceedings to which the Plaintiff was subjected contained numerous and myriad violations of the Plaintiff's due process rights.  These rights include the right to notice of the proceedings, right to a fair and impartial hearing, right to testify, right to call witnesses, the right to cross-examine witnesses against him, right to meaningfully examine the evidence and obtain copies of same, the right to counsel to participate in the proceedings and the right to be subject to proceedings defined by policies that are not vague and/or conflicting,

and the right to have the University not violate its own procedures so as to prejudice the Plaintiff.

30.   The Plaintiff was not given adequate notice of his hearing or the charges against him or the recommended sanction.   The official notice of investigation, Exhibit 2, contain nothing more than the month of the alleged offense and the place.   The University's own regulations, Appendix A (Exhibit 10) provide for a summary of the conduct that forms the basis of the investigation.   The notice received by the Plaintiff did not even meet that standard.   Based on that inadequate and unconstitutional notice, the Plaintiff was called in to an interview with a Prosecutor/Investigator, Defendant Bronson, and asked questions about his participation without revealing the facts that were alleged by the Complainant.

31.   Plaintiff was interviewed by Defendant Bronson, and subjected to an inquisition, without having been advised of the procedures that governed prosecution of the Complaint, as mandated by the University's procedures.   Plaintiff was provided with a form entitled "Notice of Rights and Responsibilities" which did not include any of the applicable procedures and rights incident to the proceeding.

32.   Plaintiff, not having been given notice of the nature of the complaint or the procedures, submitted to an interview that was not recorded.   Subsequently, a distorted report of the Plaintiff's interview was prepared by Defendant Bronson, under the direct supervision and direction of Defendant Carroll, the supervisor of the Title IX office.   The report provided an editorialization of the interview, and left out significant facts that the Plaintiff provided to the investigator, and to the police.   Nevertheless, Bronson's Investigation Report was the only evidence that the fact finding entity considered in determining the Plaintiff's fate.   During the

course of his dealings with Bronson, Bronson indicated to the Plaintiff that he viewed his role in the proceedings as a prosecutor, that he was trying to prove that the Plaintiff violated the sexual misconduct policy.  Bronson developed a list of "Disputed Facts" and "Undisputed Facts" that contained his determination of contested matters based on his view of the evidence, rather than leaving that determination to the ultimate fact finder, and that list contained erroneous categorization of such disputed and undisputed facts.  Nevertheless, under the procedures in Appendix A,

> The Special Investigator has discretion to determine whether any witness or other evidence is relevant to the finding of a policy violation. The Special Investigator may exclude information that is irrelevant, immaterial, or more prejudicial than informative from the Final Investigative Report. The Special Investigator may also exclude statements of personal opinion by witnesses and statements as to general reputation for any character trait, including honesty.

33.  After Bronson had completed his report, the Plaintiff was allowed to view a draft copy and make comments.  However, the Plaintiff was not allowed to obtain a copy of the report, nor was the Plaintiff allowed to obtain copies of the police report or J.R.'s statements to use in his defense.  Moreover, the Plaintiff was not allowed to append to the report his comments in writing, but again, only orally to the Investigator, who filtered his version of the Plaintiff's comments in the final draft of the report.  The procedures specifying these restrictions are contained in Appendix A,

> At the conclusion of the Investigation, the Special Investigator will prepare a written report that summarizes the information gathered, synthesizes the areas of agreement and disagreement between the parties with any supporting information or accounts, and includes an Investigative Finding as to whether a Policy violation has likely occurred. However, before the report is finalized, the complainant and respondent will be given the opportunity to review a draft Investigation Report, which will not include the Investigative Finding, and may be presented in redacted format. The parties will not receive an electronic or

written copy, nor may they photograph or copy the draft Investigation Report, but
they will be permitted to take notes on the content.

Thus, the Plaintiff was only allowed, in a limited setting to take notes on the report that was the

basis of the findings against him, but was not allowed to receive a copy to prepare for his

appearance before a fact finding tribunal until six days before the meeting of the adjudicatory

panel, and that copy did not include the police report or the Roe's written statement.

34. On May 5, 2015, the Plaintiff received an email from Defendant Andrea Goodwin,

Director of the Office of Student Conduct, to appear at an "Outcome Conference" scheduled for

the next day.  This email was received during the week prior to final exams, when numerous

final papers and reports were due.  The email contained an attachment containing the applicable

procedures and policies.  However, this email erroneously  advised the Plaintiff of the applicable

procedures, and contained the policy and procedures applicable prior to October 13, 2014, when

the University adopted revised procedures in disciplinary cases involving sexual misconduct.

The definitions of "Consent" and "Incapacity" are defined differently under the policy, VI-

1.20(A), which was provided by Dr. Goodwin to the Plainitff, and under the policy VI-1.60(A),

effective October 13, 2014, under which the Plaintiff was prosecuted.

35.  More importantly, however, were the procedural changes.  Under the Code of

Student Conduct, which the former policy provides as the procedures for the conduct of

disciplinary hearings, and to which Defendant Goodwin directed the Plaintiff's attention,

Plaintiff was entitled to a due process hearing that provided for the ability to be represented by a

participating counsel, the right to testify, cross-examine his accuser, and to review the evidence

against him.

36.  The Defendant Goodwin allowed the Plaintiff exactly one day to appear at an "Outcome Conference" that provided important rights to the Defendant.  Under the "Appendix A" procedures, in which the University was operating (and not the Code of Student Conduct Procedures to which the Plaintiff was erroneously advised), the Outcome Conference provided the following,

**Outcome Conference**
Upon issuance of the Investigative Finding, and where appropriate, the Director of Student Conduct will recommend sanctions and issue formal charges. Both the complainant and respondent will be notified of the Investigative Finding and the proposed sanction(s) and/or remedy(ies) in writing at the same time. The OSC will issue an Investigation Outcome Notice to each party, and invite them to schedule an outcome conference with the Director to discuss the outcome. Each party will have the opportunity to meet, separately, with the Director of Student Conduct or Assistant Director of Rights & Responsibilities depending on where the complaint originated. The Director/Assistant Director will share the Investigative Finding and, as applicable, the recommended sanction with the complainant and the respondent, and the remedy with the complainant. During the Outcome Conference, the parties will each have an opportunity to review the full Investigation Report. The parties will not, however, receive an electronic or written copy, nor may they photograph or copy the Investigation Report. The parties will be permitted to take notes on the content.

Where there has been an Investigative Finding that a Policy violation has likely occurred, the parties may:

•Accept both the Investigative Finding and proposed sanction;
•Accept the Investigative Finding, but request a SRC Conference on the recommended sanction; or,
• Reject the Investigative Finding and sanction recommendation and request a SRC Conference on both; or,
• Reject the Investigative Finding and request a SRC Conference, on the Investigative Finding to determine whether a Policy violation was committed and/or to determine an appropriate sanction.

37.  The next day, May 7, 2016, the Plaintiff received from Defendant Andrea Goodwin an email "charging letter", Exhibit 8, which adverted to different policies (VI-1.60(A), by hyperlink, the "Code of Student Conduct", by hyperlink, and "Sexual Misconduct Procedures"

20

by hyperlink. Although the Plaintiff was charged under the Code of Student Conduct Section 10 q. for "Violation of published University regulations or policies, as approved and compiled by the Vice President for Student Affairs" and specifically, the newly revised sexual misconduct policy, he was supposed to know to ignore the procedures contained in that policy, and instead figure out that he was being prosecuted not under the policy and procedure that Dr. Goodwin had specifically advised him about 2 days prior, but to understand that Appendix A was the applicable procedure, even though there was a conflict between the procedures provided for under the Code of Student Conduct, and the newly revised sexual misconduct policy.  The vague and conflicting advice given to the Plaintiff were, in and of themselves, violation of his due process rights, along with the failure to notify the Plaintiff that Goodwin was recommending expulsion from the University.

37.   Moreover, the Plaintiff was charged, vaguely, with "Violation of the Sexual Misconduct Policy."  That broad policy prohibited Dating Violence, Domestic Violence, Relationship Violence, Retailiation, Sexual Assault, Sexual Contact, Sexual Exploitation, Sexual Harrassment, Sexual Intimidation, Sexual Misconduct, Sexual Violence, and Stalking.  Each of these prohibited conducts were separately defined.  Of particular interest is the definition of "Sexual Misconduct" which the policy provides as follows:

> "Sexual Misconduct" is an umbrella term that encompasses dating violence, domestic violence, sexual harassment, sexual assault, sexual contact, sexual exploitation, sexual intimidation, relationship violence and stalking. Sexual misconduct can occur between strangers or acquaintances, including people involved in an intimate or sexual relationship. Sexual misconduct can be committed by any person, regardless of gender identity, and can occur between people of the same or different sex, sexual orientation or gender expression.

Accordingly, the Plaintiff was given notice that he was charged for conduct that may have involved nine separate and distinct ways of violating the sexual misconduct policy. Accompanying the charging letter was the redacted copy of the Investigation Report, without the Police Report attached.

39.   The Plaintiff requested an adequate time to prepare and obtain representation for his "hearing" before the Standing Review Committee, the ultimate fact finder under the Appendix A procedures (Exhibit 7).   He was denied that request, and was required to appear within 6 days of the Charging Notice (Exhibit 8) to appear before the Committee.   Defendant Goodwin correctly advised him that the appearance before the Standing Review Committee was not a hearing, as provided for under Appendix A, and the charging letter advised as follows:

> The Standing Review Committee is the formal body composed of a combination of five students, faculty and staff who are specifically trained to hold conferences with all the parties and any witnesses in order to review the information presented by the Special Investigator (and others as the SRC deems appropriate) to make a determination as to whether a Policy violation has occurred and impose sanctions as applicable. During the Standing Review Committee you will have an opportunity to listen to the report presented by Josh Bronson, Special Investigator. Following Mr. Bronson's report you will have an opportunity to ask questions regarding the report whereby the Chair of the Committee will facilitate this process. Be prepared to answer clarifying questions from the committee and discuss the impact this reported incident has had on you.

40.   The Defendant requested that Goodwin take action against Bronson for his bias in the investigation.   Goodwin deliberately ignored or was indifferent to the Plaintiff's request. Plaintiff requested that Goodwin subpoena witnesses to the hearing, which request Goodwin similarly ignored.

41.   At his appearance before the Standing Review Committee, the Plaintiff was not allowed a participating advocate.   The Plaintiff attempted to tell his side of the story, but was cut

off from making his explanation.  The only presenter of evidence was Defendant Bronson who had received specialized training in prosecuting these cases.  Defendant was not able to call witnesses.  Defendant submitted written statements of witnesses that were not contacted by Bronson, that contradicted the Police Report.  Those statements were discounted by the Committee, which relied instead on the 2nd degree hearsay account of the Police Report, which the Committee found to be more credible.  The complainant, J.R. did not appear, and was not subject to cross-examination.  The Committee made ultimate fact finding decisions that were unsupported by **any** evidence, including the finding that the Plaintiff "masqueraded" as K.P. The Plaintiff was never given any opportunity to test the credibility of the complainant's account, by cross-examination, to explore the disparity between the account given to the police and the account given to Bronson.

42.  Additionally, the Plaintiff was subjected to a lower standard of proof, "preponderance of the evidence" in this sexual misconduct proceeding, than would be required as to any other disciplinary violation under the Code of Student Conduct, a "clear and convincing evidence" standard.  This standard of proof is not consistent with the liberty and property interests at stake in sexual misconduct complaints.

43.  At the time of the Plaintiff's expulsion from the University of Maryland, he would have been 3 credits shy of graduation, had he been given credit for the spring semester that he had already completed in 2015. The Plaintiff had expended significant sums, over $80,000 in tuition, room, board, and books, over the 4 and 1/2 years that he had attended the University.  In addition, he has been denied the degree for which he expended such sums.  In addition, the

deprivation of a degree for which the Plaintiff has invested over 4 years will continue to cost him significant monies in the future, including lost employment opportunities and reduced income.

44.  In addition to the property interest implicated, Plaintiff has been deprived of a significant liberty interest, in that a permanent notation in his student record that he has been found guilty of sexual misconduct prevents him from being admitted to other colleges and universities or to advance any post-graduate course of education.  The finding that the Plaintiff committed sexual misconduct is a blot on the Plaintiff's good name, reputation, honor and integrity, and has acted as a "Scarlet Letter" that has prevented the Plaintiff from being accepted at any other colleges and universities to obtain his undergraduate degree, and it is unlikely that he will be accepted to any university in the future.

45.  The deprivations of due process and other rights as provided in this Complaint are ongoing and continuing.

**Gender Discrimination**

46.  Upon information and belief, in virtually all cases of alleged sexual misconduct at the University of Maryland, College Park, the complainant is a female and the respondent is a male.

47.  In March 2014, the University of Maryland, College Park appointed Defendant Catherine Carroll as Title IX coordinator, for the purpose of implementing and recommending new procedures in sexual misconduct proceedings.  Carroll is an attorney with an extensive history in the women's rights movement.  Recently, in applying for a job as the Title IX coordinator at the University of Oregon, Carrolll sent a cover letter and Curriculum Vitae to that University, attached hereto as Exhibit 13.  In that letter, Carroll wrote,

> My legal background, passion and expertise in sexual violence offers a
> sophisticated understanding and analysis of gender based violence with practical
> experience negotiating the complexity of the legal issues regarding Title IX
> compliance within higher education.

That history included multiple jobs dealing with "Violence against Women" and "Women's

Legal Counseling."  As Legal Director for the Washington [State] Coaltion of Sexual Assault

Programs, Carroll was the editor of a book, <u>Beyond the Criminal Justice System, Transforming</u>

<u>Our Nation's Response to Rape, A Practical Guide to Representing Sexual Assault Victims</u>,

Washington Coalition of Sexual Assault Programs, Washington State Edition, 2004[10].

That publication contained the following:

> **A NOTE ON TERMINOLOGY**
> This Manual is intended to be a resource that is accessible, concise, and useful to
> the practitioner. To meet this goal, we have made various choices about
> terminology and usage that we hope will illuminate rather than obscure the
> difficult issues and questions we discuss.
> **Victim/Survivor:** We have generally chosen to use the term "victim" over the
> term "survivor" because it is the term used in the criminal justice system and in
> most civil settings that provide remedies for rape and sexual assault victims.
> Because this Manual is a guide for attorneys and advocates who are negotiating
> these systems with their clients, using the term "victim" allows easier interfacing
> with these systems.
> **She/He:** Although both males and females are victims of rape and sexual assault
> and females can be assailants, in the overwhelming majority of cases, the
> assailant is male and the victim is female. We have chosen, therefore, to use the
> female pronoun when describing the victim and the male pronoun when
> describing the assailant.
> **Assailant:** Depending upon the context within the Manual, a rapist may be
> described in several ways, including as the perpetrator or the defendant. For the
> most part, in this Manual we have chosen to use the term "assailant" as it
> accurately describes those cases where the rapist has been formally charged with
> a crime and those cases where no criminal charges are pending. We recognize, of
> course, that until there is a conviction, there is only an allegation of a crime.
> Because this Manual is written for attorneys and advocates for the victim, we

---

[10]The publication can be accessed at http://docplayer.net /2873569-Acknowledgements-editor-washington-state.html

have chosen not to include the term "alleged" when describing either the assault or the assailant.

**Sexual Orientation:** This Manual addresses heterosexual rape and sexual assault. Some of the issues and questions which arise within the context of same-sex sexual assaults are similar to those arising in different-sex sexual assaults, although there are also many differences. A full discussion of these differences is beyond the scope of this Manual.

That same publication opined that allowing women to be cross-examined in student sexual misconduct proceedings should be challenged as a "due process violation" as to the victim. *Id.* p. 6-11.

48.   The Title IX Office at the University of Maryland has a large poster as one walks in the front door with a picture of a female student, directing men to "Take a Walk in Her Shoes" in combating sexual misconduct.

49.   Carroll is responsible for the training of all personnel that work in her office and those personnel involved in the disciplinary process, including Bronson and Goodwin, and, upon information and belief, the training of the persons that sit on the Standing Review Committee in judgment of respondents in sexual misconduct cases.

50.   Upon information and belief, Carroll's belief that "in the overwhelming majority of cases, the assailant is male and the victim is female" evidenced gender bias in her treatment of respondents in sexual misconduct cases and anti-male animus.  This is supported by her assertion that she has a sophisticated understanding of "gender-based" *i.e.* male on female, violence. Additionally, Carroll's gender bias against men permeates the Office of Sexual Misconduct at the University of Maryland, as evidenced by the fact that men need to be educated as to what it's like to be a woman at the University of Maryland, by "Taking a Walk in her Shoes."

51.  Upon information and belief, the training materials given to Bronson, Goodwin, and the panel members of the Standing Review Committee contain various misconceptions, such as that victims of sexual assault rarely if ever fabricate their stories, and that "trauma informed investigative techniques based on national best practices," in which Carroll has trained Bronson and other in her office, include suggestions that women who, by their behavior, went along with a sexual advance, upon later reflection, were not really consenting even though their actions indicated as such.  Upon information and belief, these "trauma informed investigation techniques" were developed by the US Department of Justice Office of Violence against Women and the International Association of Chiefs of Police, and the goal of these techniques, among other things, is to "conduct victim interviews and document sexual assault cases utilizing physical, psychological and sensory evidence to effectively build a strong case.[11]"  These techniques are consistent with Bronson's statement to the plaintiff that his role was to build a case for a policy violation.

52.  Upon implementation of the Sexual Misconduct Policy, the President of the University, Defendant Loh, told the University of Maryland student newspaper, The Diamondback, "the policy isn't without its shortcomings, however. Banning cross-examination and limiting the committee to five people who decide with a majority vote can make it easier to find the accused person responsible."University makes comprehensive changes to its sexual misconduct policy, The Diamondback, E. Silverman, October 14, 2014, http://www.dbknews.com/archives/article_136dd9e2-5410-11e4-9751-0017a43b2370.html.  See Exhibit 14, attached.  Loh knew that these procedures would pose a risk of an erroneous outcome

---

[11]http://www.iacp.org/Trauma-Informed-Sexual-Assault-Investigation-Training

subjecting male students to erroneous outcomes in sexual misconduct disputes.  The next day,

Carroll was interviewed by The Diamondback, "In the new procedures, a sexual assault survivor

can choose not to see the assailant during the entire process and no cross-examination can occur.

This is included, Carroll said, to make sure the survivor is not "re-traumatized" by the

university's process.  New Univ. of Md. sexual assault policies receive praise from victims

advocates, The Diamondback, E. Silverman, October 15, 2014, http://www.dbknews.com/

archives/article_d3bc392a-54c2-11e4-b880-0017a43b2370.html. See Exhibit 15, attached.

Carroll knew that the failure to allow cross-examination or to require the complainant to

particpate posed an unreasonable risk of an erroneous outcome for male students that were the

subject of sexual misconduct complaints.

    53.  In adopting the revised Sexual Misconduct Policy that eliminated hearing rights, as

previously alleged, and changing the standard of proof, UMCP admitted, in the Code of Student

Conduct, that such changes were based on directives of the US Department of Education Office

of Civil Rights ("OCR").

    54.  In August, 2013, UMCP, through a joint task force of the University President and

the University Senate, issued a Final Report recommending changes the Sexual Harassment

Procedures that ultimately resulted in the policy changes discussed herein, above.  A copy of that

Report is attached hereto as Exhibit 16.  That report noted, at pp. 5-6 stated,

> In April 2011, the Office Civil Rights, Department of Education issued a "Dear
> Colleague" guidance letter clarifying certain requirements and recommending
> best practices with respect to Title IX compliance as it relates to university
> response and prevention of sexual misconduct (see Appendix 4 for a copy of the
> April 2011 "Dear Colleague" letter and a relevant fact sheet). In reauthorizing the
> Violence Against Women Act (VAWA), Congress also imposed additional
> requirements regarding sexual misconduct protocols on university campuses,

which take effect in Spring 2014 (see Appendix 5 for a summary of the additional requirements).

The immediate need to improve Title IX sexual misconduct program compliance, meet new requirements as a result of the reauthorization of VAWA, and improve campus safety, highlight an immediate need for the University to elevate the role of its existing Title IX Coordinator. The core duties and responsibilities of a Title IX Coordinator, as set forth in federal regulations (and as interpreted by DOE guidance) include:

• Monitoring and oversight of the university's overall implementation of Title IX compliance.
• Notification, prevention and education of the campus community regarding: (1)Title IX rights and responsibilities, focusing on prohibitions against sexualharassment, sexual assault, and sexual misconduct, (2) relevant university policies, including the processes for filing complaints for
purposes of investigation and resolutions, (3) reporting options available both on and off campus, and (4) the existence of available resources, including the health center, counseling center, and rape crisis center.
•  Coordinate training for the campus community, which includes: (1) students, faculty, and staff, (2) "responsible employees"/"first responders" who receive complaints, (3) investigators and adjudicators of complaints, and (4) campus law enforcement officers who deal with victims' rights under Title IX, including the right to file Title IX sexual misconduct complaints for investigation and resolution by the university in addition to making a criminal complaint.
• Coordinate the receipt, investigation, and disposition of complaints of alleged sexually discriminatory behavior in violation of Title IX, other federal or state law, or university policies.
• Maintain records and data, issue annual reports, and note trends to enhance Title IX compliance and promote campus safety.

The "Dear Colleague" letter advising colleges and universities receiving federal funds to make changes in their sexual misconduct procedures as provided in the letter (attached as a part of Exhibit 17, Appendix 4) caused UMCP to fear that it would be subject to investigation and action by the federal government, including loss of federal funds if it failed to address sexual violence on campus, and changed its procedures accordingly.  The sexual violence that sought to be addressed was violence against women, as stated in the material appended to the report.

55. The actions of Loh and Carroll, in promulgating the Sexual Misconduct Policy, was a direct result of gender bias against males, which caused the Plaintiff the process violations and the failures to take remedial action regarding his complaints of bias.

**COUNT I**

42 U.S.C. § 1983 - Fourteenth Amendment Due Process
(as against all Defendants; for money damages in their individual capacities
and for injunction relief in their official capacities)

56. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

57. Fourteenth Amendment due process protections are required in higher education disciplinary decisions.

58. A person has a protected liberty interest in his good name, reputation, honor and integrity which he cannot be deprived of by the state  absent  due process.

59. A person has a protected liberty interest in pursuing his education, as well as future educational and employment opportunities and occupational liberty, which the state cannot deprive him of absent due process.

60. A person has a protected property interest in his education, which the state cannot deprive him of without affording him of absent due process.

61. Plaintiff had a constitutionally protected liberty interest in his good name, reputation, honor and integrity.

62. Plaintiff had a constitutionally protected liberty interest in pursuing his education, as well as future educational and employment opportunities.

63. Plaintiff had a constitutionally protected property interest in continuing his education at the University of Maryland.

64.  Plaintiff was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions and repercussions he was facing. Here the allegations were of the utmost seriousness, have lifelong ramifications and are quasi-criminal in nature.

65.  Plaintiff was entitled to fundamentally fair procedures to determine whether misconduct occurred.

66.  Nothwithstanding same, Plaintiff was disciplined, expelled and sanctioned by Defendants, depriving him of his liberty and property interests, without being afforded basic due process, including but not limited to notice of the allegations against him and an opportunity to be heard.

67.  Plaintiff was denied notice of the allegations against him when he was interviewed by Defendant Bronson, without having being advised of the Complainant, J.R.'s statement against him, or notice of the conduct that he was being called to account for, which deprived him of the opportunity to prepare and fully respond. Thus, Plaintiff was denied the opportunity to be heard in any meaningful way.

68.  Plaintiff was never afforded any type of hearing, much less a meaningful hearing providing him with the opportunity to respond, explain and defend.

69.  Plaintiff never received written notice of the specific provisions of policy for which charges were leveled against him, nor the sanctions that the University was seeking against him.

70.  Plaintiff received nothing in writing by the Complainant.

71.  Plaintiff was not allowed to confront, much less cross-examine, his accuser, or to have a third party do so.

72.  Plaintiff was not allowed to call witnesses, or compel their attendance.

73.  Plaintiff was not allowed a fair opportunity to prepare for his hearing or hire counsel, when given only six days notice of the adjudicatory hearing, and no notice of the resources available to him, when he requested and was denied a postponement of his hearing.

74.  Plaintiff was never provided with complete copy of the Investigation Report that had the complainants statements to the police.

75.  Plaintiff was provided with misleading, erroneous, vague and conflicting information from Defendant Goodwin and the other Defendants so as to the procedures applicable to his case, and the regulations and policies themselves were conflicting in their application, so as to deny the Plaintiff a fair opportunity to defend himself.

76.  Plaintiff was denied a prompt, thorough and impartial investigation.

77.  Plaintiff was denied a meaningful opportunity to clear his name.

78.  Plaintiff's liberty and property interests were invaded by Defendants in an arbitrary and irrational manner.

79.  Defendant Bronson was the sole investigator, and finder of fact and decision maker, notwithstanding the sham convocation of the Standing Review Committee, which considered only evidence as filtered by Bronson.

80. Defendants Bronson, Carroll, Loh, Clement, and Goodwin created and effectuated a policy, pattern and practice which deprived Plaintiff of his constitutional rights.

81.  Defendants' actions and inaction as set forth above were fundamentally unfair to Plaintiff.

82.  Defendants' actions and inaction in the above matter were unduly prone to false findings of sexual misconduct.

32

83.  Defendants' actions were arbitrary and capricious.

84.  There exists no rational relationship between Plaintiff's actual conduct and the discipline imposed against him by Defendants, and the actions of the Defendants caused an erroneous outcome

85.  In depriving Plaintiff of his constitutionally protected rights, including his liberty interest in his good name, reputation, honor and integrity, opportunity to pursue education and employment; and his property interest in his education, Defendants violated Plaintiff's right to due process of law in violation of the Fourteenth Amendment to the United States Constitution. Defendants Bronson, Carroll, Goodwin, Martone, Clement, and Loh, and other agents, representatives, and employees of the University of Maryland acting under color of state law and in concert with one another, by their conduct, showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

86.  At all times material hereto, Plaintiff had a clearly established right to due process of law of which a reasonable public official would have known.

87.  As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including but not limited to expulsion from the University of Maryland, denial of his undergraduate degree, a notation on his permanent record that he was expelled for "sexual misconduct" depriving him of future educational and employment opportunities including undergraduate, graduate school and career choices; false and permanent findings and discipline on Plaintiff's record for serious sexual misconduct which did not occur; damage to Plaintiff's standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other educational

or employment opportunities; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

## COUNT II
42 U.S.C. § 1983 - Fourteenth Amendment Equal Protection
(as against all Defendants; for money damages in their individual capacities
and for injunction relief in their official capacities)

88.   Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 87 and fully incorporates same by reference.

89.   As previously related, Carroll was motivated by gender bias when she helped promulgate a sexual misconduct policy that denied procedural rights to men, including the Plaintiff, that denied the right of confrontation, the right to counsel, the right to compel appearance of witnesses, the right to testify in one's own behalf, and lowered the standard of proof in sexual misconduct proceedings.

90.   Additionally, Carroll was motivated by gender bias when, upon information and belief, she instituted training programs that contained gender stereotypes against male respondents in sexual misconduct proceedings, and that applied different standards to the investigation of female complainants as opposed to male respondents.

91.   Goodwin were motivated by gender bias when she conducted a procedure that failed to protect the Plaintiff from due process violations, that failed to heed his complaints about bias in the process, and was purposely indifferent to his claims, and failed to grant the Plaintiff a continuance, subpoena witnesses, and wrongfully informed him as to the procedures.

92.   Bronson was motivated by gender bias when he treated the complainant differently than he treated the Plaintiff, when he was motivated by the desire to convict the Plaintiff, a male,

34

of a policy violation, by misstating his position in his report, and by failing to contact necessary witnesses and provided false information as to his efforts to contact those witnesses.

93.   Loh was motivated by gender bias when he enforced and promulgated a procedure that he knew would treat males in a disadvantageous fashion as opposed to females in the University disciplinary context.  The discriminatory regulations promulgated by Loh and Carroll had a disparate impact among male students as opposed to female students.

94.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including but not limited to expulsion from the University of Maryland, denial of his undergraduate degree, a notation on his permanent record that he was expelled for "sexual misconduct" depriving him of future educational and employment opportunities including undergraduate, graduate school and career choices; false and permanent findings and discipline on Plaintiff's record for serious sexual misconduct which did not occur; damage to Plaintiff's standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other educational or employment opportunities; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

## COUNT III
Title IX Sex Discrimination claims against UMCP

95.   Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 94 and fully incorporates same by reference.

96.   Title IX of the Education Amedments of 1972 20 U.S.C. §§ 1681-1688, provides, in pertinent part, that "no person in the United States shall, on the basis of sex, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.  20 U.S.C. § 1681(a).

97.  UMCP receives federal financial assistance and is subject to Title IX.

98.  A private right of action exists under Title IX for a party to seek redress, including money and other relief.  State institutions that elect to receive federal financial assistance waive immunity under the Eleventh Amendment for suits its citizens in the federal courts.

99.  As previously alleged, virtually all cases of sexual misconduct at UMCP involve complaints by female complainants against male respondents.

100.  As previously alleged, Defendant Catherine Carroll has a history of gender bias against males, based on her prior publications and statements, believing that almost all "assailants" are male and that all "victims" are female.  Carroll believes that almost all violence committed in the realm of sexual misconduct is "gender based" violence.  As a result, and based on her beliefs, Carroll created a hostile environment for male students accused of sexual misconduct.  This hostile environment was communicated to Bronson and Goodwin.  This hostile environment amounted to sexual harassment of the Plaintiff.  In particular, the denial and removal of hearing rights relative to other types of student misconduct, the deliberate indifference to the Plaintiff's complaints by Goodwin and the hearing panel, and the refusal to allow a fair hearing process for the Plaintiff as previously alleged were known, or should have been known, to UMCP personnel and the Defendants.

101.  There was a disparity of power between the Defendants that created or knew about the hostile environment towards males and the Plaintiff.  UMCP and the individual Defendants

had control over the adjudicatory process and the power to expel the Plaintiff.  The Plaintiff had

no power to force UMCP and the individuals to take any type of remedial action.

102.  UMCP knew, or should have known about the hostile environment that was created

based on gender bias against males in general and the Plaintiff, in particular, but failed to take

any remedial action, and/or was deliberately indifferent to the conditions created.

103.  Additionally, the policies and procedures that UMCP adopted as a result of the

pressure from the federal government, along with the statements of Carroll, Goodwin, and Loh,

show the gender bias that was caused by the fear of federal action against the university, as noted

in Exhibit 17, the Task Force Report.

104.  Additionally, there was a climate on campus that contributed to gender

discrimination against males, including the Plaintiff.  For example, UMCP has an office called

CARE (Campus Advocates Respond and Educate to Stop Violence) sponsored an on-campus

event in November, 2014, in the days just prior to the events involved in the Complaint, called

"The Clothesline Project" addresses violence perpetrated by men against women, where purple t-

shirts were hung on campus that women effected by sexual violence illustrated to show their

emotions.  A copy of the UMCP's sponsorship of "The Clothesline Project is attached as Exhibit

18, and the cover page of the website of The Clothesline Project, www.clotheslineproject.org, is

also attached as part of that exhibit.

105.  Upon information and belief, UMCP has actual or constructive knowledge that

UMCP's investigation and discipline of the Plaintiff and other male students posed, and

continues to pose an unreasonable risk of gender discrimination against male UMCP students,

including the Plaintiff.

106.  Plaintiff further alleges that, upon information and belief, there are communications between UMCP officials evidencing UMCP's intent to favor female students alleging sexual assault over male students accused of same.

107.  Plaintiff alleges that the Defendants deliberate indifference to the gender bias and hostile environment exhibited towards the Plaintiff, as stated herein, was for the purpose of demonstrating to the US Dept. of Education Office for Civil Rights and the public that UMCP was aggressively disciplining male students accused of sexual misconduct.

108.  As a direct result of the gender bias against males, including the Plaintiff, as alleged herein, and the deliberate indifference of UMCP officials, improper procedures as stated herein above were instituted that caused the Plaintiff to be found responsible for a policy violation resulting in his expulsion from UMCP, when he was actually innocent of the allegations.  The anti-male bias and those defective procedures foretold the resultant outcome.  The discriminatory procedures described herein had a disparate impact on male students as opposed to female students.

109.  As a direct and proximate result of Defendants' unlawful actions, the Plaintiff was injured as specified in Paragraph 89, above.

**COUNT IV**
(State Constitutional Due Process claims against the individual Defendants, or
alternatively, against the Board of Regents/UMCP[12])

---

[12]The allegations in Counts IV -VII (State Law Claims) are made in the alternative, against the individual Defendants Bronson, Carroll, Goodwin, and Loh, for acts involving malice or gross negligence, or, alternatively, against the Board of Regents/UMCP.  Md. Cts. & Jud. Proc. Code § 5-522 provides that the immunity of the State of Maryland is not waived under Md. State Gov. Code §§ 12-101, *et seq.* ("The Maryland Tort Claims Act") for the tortious acts and omissions of State personnel acting within the scope of their public duties, or made with malice or gross negligence.  The State, however, does waive immunity for up to $400,000 in damages,

110.  Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 109 and fully incorporates same by reference.

111.  Under Article 19 of the Maryland Declaration of Rights, "That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the Land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the Land."

112.  Under Article 24 of the Maryland Declaration of Rights, "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

113.  These due process clauses of the Maryland Constitution provide protection to Plaintiff as to his rights consistent, if not greater, than the rights afforded to him under the due process clause of the United States Constitution.

114.  In depriving Plaintiff of his constitutionally protected rights, as aforesaid, including his liberty interest in his good name, reputation, honor and integrity, opportunity to pursue education and employment; and his property interest in his education, Defendants violated Plaintiff's right to due process of law in violation of the Article 19 and Article 24 of the Maryland Declaration of Rights.

---

for tortious acts or omissions of its personnel committed within the scope of their duties not committed with malice or gross negligence.  Accordingly, depending on whether the acts complained of herein were committed with malice or gross negligence, either the individual defendants are liable, or UMCP, through the Board of Regents, is responsible.

115.   The Defendants had a duty to provide due process of law as required by the Maryland Constitution in the disciplinary process to which the Plaintiff was subjected.

116.   Defendants Bronson, Carroll, Goodwin, Clement, and Loh, and other agents, representatives, and employees of the University of Maryland in the course of their duties and in concert with one another, by their conduct, showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

117.   Said Defendants acted with malice and/or gross negligence in depriving the Plaintiff of his rights as aforesaid.

118.   Alternatively, the Defendants acted with negligence, and violated their duty of due care, when they deprived the Plaintiff of rights guaranteed under the Maryland Constitution without due process of law.

119.   As a direct and proximate result of Defendants' unlawful actions, the Plaintiff was injured as specified in Paragraph 89, above.

**COUNT V**
(State Constitutional Equal Protection claims against the individual Defendants, or
alternatively, against the Board of Regents/UMCP)

120.   Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 119 and fully incorporates same by reference.

121.   Although it is not explicitly stated, Article 24 of the Maryland Declaration of Rights guarantees to the people of Maryland Equal Protection of the Laws.

122.   Maryland's Equal Protection guarantees found in the due process clause of the Maryland Constitution provide protection to Plaintiff as to his rights consistent, if not greater,

than the rights afforded to him under the equal protection clause of the United States

Constitution.

123.  Plaintiff incorporates by reference the equal protection claims found in Count II,

above.

124. Said Defendants acted with malice and/or gross negligence in depriving the Plaintiff

of his rights as aforesaid.

125.  Alternatively, the Defendants acted with negligence, and violated their duty of due

care, when they deprived the Plaintiff of equal protection of the law, as guaranteed under the

Maryland Constitution.

126.  As a direct and proximate result of Defendants' unlawful actions, the Plaintiff was

injured as specified in Paragraph 89, above.

## COUNT VI
(State Constituional claims under the Equal Rights Amendment)

127.  Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 126

and fully incorporates same by reference.

128.  Article 46 of the Maryland Declaration of Rights, the State Equal Rights

Amendment, provides, "Equality of rights under the law shall not be abridged or denied because

of sex."

129.  As previously stated above, the Sexual Misconduct Policy and Procedure, as

promulgated by Defendants Loh and Carroll, while facially gender-neutral, were intended to

cause an adverse and unequal impact upon male students, as opposed to female students.   The

promulgation of the Procedures had a discriminatory purpose and effect, as previously related,

and had a disparate impact on male students as opposed to female students.

41

130.   The Sexual Misconduct Policies and Procedures, as practiced by all of the Defendants as previously related above, discriminated against the Plaintiff based on his male gender.

131. Said Defendants acted with malice and/or gross negligence in depriving the Plaintiff of his rights as aforesaid.

132.   Alternatively, the Defendants acted with negligence, and violated their duty of due care, when they deprived the Plaintiff of equal protection of the law, as guaranteed under the Maryland Constitution.

133.   As a direct and proximate result of Defendants' unlawful actions, the Plaintiff was injured as specified in Paragraph 89, above.

**COUNT VII**
(Negligence)

134.   Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 133 and fully incorporates same by reference.

135.   The Defendants (individually, and the UMCP) had a duty of reasonable care in the implementation of the UMCP's Sexual Misconduct Policy and Procedure.

136.   As previously related, the Defendants Carroll, Bronson and Goodwin breached their obligations to the Plaintiff in carrying out the UMCP Sexual Misconduct Procedures that caused harm to the Plaintiff.

137.   Said Defendants acted with malice and/or gross negligence  in failing to use reasonable care in implementing the Sexual Misconduct Policy as it related to the Plaintiff, as previously related.

138.  Alternatively, the Defendants acted with negligence, and violated their duty of due care, in implementing the Sexual Misconduct Policy as previously related.

139.  As a direct and proximate result of Defendants' negligence, the Plaintiff was injured as specified in Paragraph 89, above.

WHEREFORE, the Plaintiff prays that he be awarded the following relief against the Defendants, jointly and severally,

A.  Legal Relief

1.  Compensatory Damages as against the individual Defendants Bronson, Carroll, Goodwin, Clement, and Loh, in an amount greater than $75,000, jointly and severally;

2.  Exemplary Damages as against the individual Defendants Bronson, Carroll, Goodwin, Clement, and Loh;

3.  Compensatory Damages as against the Defendant Board of Regents/UMCP in an amount greater than $75,000 in Counts III through VII.

4.  An award of attorneys fees, expert witness fees, litigation expenses, and costs.

B.  Equitable Relief

1.  Removal from the Plaintiff's student record and files any reference to the sexual misconduct investigation, sanction, findings, or expulsion;

2.  Reinstatement to the University of Maryland as a student in good standing;

3.  An injunction prohibiting further acts of retaliation or sanctions against the Plaintiff arising out of the events that are the subject of this Complaint;

    4.  An award of attorney's fees, expert witness fees, litigation expenses, and costs.

    5.  Such other and further relief as the nature of the Plaintiff's cause may require.

Respectfully submitted,

/s/ Ronald L. Schwartz
Ronald L. Schwartz 07159
4907 Niagara Road, Suite 103
College Park, Maryland 20740
(301) 474-2300
ronaldschwartz@verizon.net

CLARK & STEINHORN, LLC

/s/ Robert V. Clark
By: Robert V. Clark Fed #02738
9101 Cherry Lane, Ste. 204
Laurel, MD 20708
(301) 317-1002
rvcj@verizon.net
Attorneys for Plaintiff

## JURY DEMAND

Plaintiff demands a jury trial for all matters triable by right before a jury.

/s/ Ronald L. Schwartz
Ronald L. Schwartz

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of March, 2017, I served pursuant to the CM/ECF system all counsel of record in the above noted matter.

/s/ Ronald L. Schwartz
Ronald L. Schwartz