# EXHIBIT 6

# New group trains to review sexual misconduct cases

By (esilvermandbk@gmail.com)
Published September 11, 2015

Each time one female student walked to the dorm shower in her towel, the boys on the floor would all come out of their rooms to watch.

But the girl had "thick skin" and taught herself to ignore it, said Catherine Carroll, the Office of Civil Rights & Sexual Misconduct director and Title IX officer.

"If we have to deal with this all the time then we don't necessarily recognize it as a problem," Carroll said. "She's writing it off like it's not an issue, but it is a huge issue."

This was one example Carroll used while training a new group of more than 20 students, faculty and staff to become potential members of a review committee for this university's sexual misconduct cases.

The training, which took place in Marie Mount Hall from 9 a.m. to 5 p.m. Friday, included an overview of the university's sexual misconduct policy and interim student procedures and the role of the Standing Review Committee, a body of five people.

The five SRC members per case are chosen from a roster composed of students, staff and faculty.

The current interim procedures task the SRC with determining if a sexual misconduct policy violation occurred and then, based on that finding, making a sanction recommendation, which could be as severe as suspension or expulsion.

This occurs after the sexual misconduct office conducts its investigation and presents its finding to the SRC. Then, the SRC will have a chance to read the report and question the investigator. During the questioning, both parties involved in the case are allowed to be present.

The SRC is also trained to recognize behaviors that violate university policy, even if the victim does not realize the severity of a situation.

For example, Carroll said, a female student could be receiving incredible amounts of text messages from a male student, saying he spotted the girl on campus or asking to meet up, even after the girl said she was not interested. Although some people may brush off this type of encounter as just annoying, Carroll said it is harassment.

"People are processing things," Carroll said. "There may be a total disconnect from what the victim says because they're not making that connection."

This disconnect can occur because that person has experienced a trauma, which affects the brain and body differently, said Kristen McGeeney, one of the office's special investigators.

McGeeney, along with Josh Bronson, the office's assistant director and lead special investigator, led a session during the training on trauma informed investigations and rape culture.

When a person undergoes a stressful situation, chemicals, such as catecholamine, or natural adrenaline, corticosteroids or energy, opioids or natural morphine and oxytocin or good feelings, can be released, McGeeney said.

This can explain behavior that may be observed as odd, given a situation of sexual assault, McGeeney said.

Some people may think they know what they would do if they were in a similar situation, such as "'I know that I would fight or I know that I would run away,'" McGeeney said. "But the reality is your ability to exercise that rational thought just goes out the window."

A victim may also experience "tonic immobility," which is when a victim feels frozen and cannot move. Dissociation — when the victim feels disconnected from his or her body — may also occur.

Bronson said investigators could tell in an interview if a student has undergone this type of trauma by phrases such as, "he did this to me," "I saw this happen to me," or "I couldn't move."

Traumatic memory is fragmented, which is why a victim might remember different details each time he or she is questioned, Bronson said. This is often misinterpreted as lying.

It's important for the SRC to be able to correctly identify subtleties like this within a report, Bronson said.

"If we are writing in our report and we're explaining tonic immobility, we hope you're able to understand the characteristics of it," Bronson said.

Bronson said investigators start an interview by asking a victim: "What are you able to tell me about your experience? Where would you like to begin?"

They never ask "why" questions, such as "why did you… or why didn't you…?" because, he said, it sounds like victim blaming.

"The person's mind is part of a crime scene that occurred," Bronson said. "A person's memories and fears and thoughts are part of a crime scene."

Bronson stressed the importance of making an impartial decision once all the information has been presented.

"I challenge you to get those biases out of there and look at the facts of the case," Bronson said. "You don't have an easy job."

PLEASE HELP SUPPORT OUR JOURNALISM BY DONATING TO THE DIAMONDBACK.

**COMMENTS**

**Janet Breaks Silence On Controlling Husband**
Janet Jackson Splits From Wissam Al Mana After Five Years of Marriage

Learn More

Sponsored by MyCelebrityInsider

Report ad

0 Comments    The Diamondback                                    1  Login

♡ Recommend    ⤴ Share                                           Sort by Best

Start the discussion…

Be the first to comment.

**ALSO ON THE DIamondback**

**In Silver Spring, gentrification strikes close to home**
3 comments • a month ago•
  Lord Caldlow — "Ah the good old days, when I was a wee lad at the tender age of 16" says the 19 year …

**Some UMD students call on administration to provide …**
1 comment • 7 days ago•
  John J — Meanwhile I as a gay man declined to attend any of UMD's pride events because of the school …

**Israel does not deserve to be celebrated**
1017 comments • a month ago•
  Gnarlodious — Some Jew in Maryland thinks he knows all the answers to Israel's problems. What a shocker!

**2 Chainz saves the day at Art Attack XXXIV**
2 comments • 23 days ago•
  Ganesha_akbar — Art Attack Karma: DC Social justice warrior Corrina Mehiel-- who profited off racial …

✉ Subscribe    ⊕ Add Disqus to your siteAdd DisqusAdd    🔒 Privacy

**DBK TOP STORIES**