IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| JOHN DOE, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. PX-16-3314 |
| | * | |
| WALLACE LOH, | * | |
| *et al.*, | * | |
| Defendants. | | |

*******

## MEMORANDUM OPINION

Plaintiff John Doe ("Doe"), a former student at the University of Maryland, College Park ("UMCP"), proceeding pseudonymously, brings this action to challenge UMCP's decision to expel him for sexual misconduct.  Doe asserts claims pursuant to 42 U.S.C. § 1983 for violations of his Fourteenth Amendment rights to due process and equal protection, and claims alleging Title IX gender discrimination, violations of the Maryland constitution, and other state common law claims against the University's Board of Regents in their capacity as the governing body of UMCP, and against Defendants Wallace Loh, Linda Clement, Josh Bronson, Catherine A. Carroll, and Andrea Goodwin, individually and in their official capacities as UMCP employees. ECF No. 38.  The issues are fully briefed and a hearing on the motion was held on March 23, 2018.  For the foregoing reasons, Defendants' motion to dismiss is GRANTED.

## I.    Background[1]

On the evening of December 14, 2014, Plaintiff John Doe, Jane Roe,[2] and several of Doe's friends, identified as "K.P" and "A.S.," left a College Park, Maryland bar for K.P. and

---

[1]  The Court takes the following facts from Doe's Amended Complaint and accepts them as true for purposes of this motion.

A.S.'s on-campus apartment.  Once at the apartment, Roe grew tired and fell asleep in K.P.'s

bedroom.  ECF No. 38 at ¶ 7.  K.P. initially joined Roe in his bed, but later complained that he

could not get physically comfortable.  K.P. left the bedroom and suggested to Doe, who was

resting on K.P.'s couch, that Doe instead sleep in the bed with Roe, and K.P. would sleep on the

couch.  *Id.*

K.P. initially claimed that at this point, Doe "brought up a dare," that he (Doe) would

"play a joke on [Roe]" by cuddling with Roe in the bed "until she turns around and realizes that

she is not 'cuddling' with [K.P.]."  *Id.* at ¶ 10; *see also* ECF No. 54-1.  Doe denies that he

proposed or engaged in any kind of a "dare," and K.P. now disclaims that Doe suggested a dare.

ECF Nos. 38 at ¶ 11; 43-2 at 27–29; 45-4.

Doe, however, did proceed to get into bed with Roe and fall asleep next to her.  *Id.*

About an hour later, Doe and Roe woke up and began kissing.  ECF No. 38 at ¶ 8; *see also* ECF

No. 54-1.  Doe fondled Roe, and asked Roe to perform oral sex on him, to which she agreed.  *Id.*

at ¶ 8.  At some point shortly after, Roe looked at Doe and exclaimed, "You're not K.P.!"  *Id.*

Doe immediately left the room.  Soon thereafter, Roe exited K.P.'s apartment, visibly upset, and

called the police.  *Id.*

At around 6:00 a.m., the Campus Police at UMCP began investigating the incident.

Campus Police took oral and written statements from Roe regarding the encounter, and

interviewed Doe, K.P, and A.S.  ECF No. 38 at ¶ 9.  Doe confirmed to the police his version of

events regarding his sexual encounter with Roe.  Doe added that he thought that Roe knew it was

him and not K.P. because Roe would recognize Doe's voice, and when they were kissing, Roe

would have seen and felt Doe's beard (K.P. is clean shaven).  ECF No. 38 at ¶ 11.  Doe also

---

[2] John Doe's accuser is identified only as "Jane Roe" in the Amended Complaint to protect her identity.  *See* ECF No. 38.

insisted to the police that he had not entered the room on a dare, and instead went to K.P.'s bedroom intending to sleep. *Id.* at ¶ 12.

The Campus Police declined to bring criminal charges against Doe, but forwarded the written incident report to the University of Maryland Office of Civil Rights and Sexual Misconduct (OCRSM) on January 27, 2015. *Id.* at ¶ 12. Roe had also filed a complaint with OCRSM. *Id.* at ¶ 13. On January 29, OCRSM notified Doe in writing that UMCP was investigating a complaint "regarding an incident of sexual misconduct" that took place on December 14, 2014 at Frederick Hall, the location of K.P.'s apartment. *Id.* The notice also forewarned Doe of the range of possible disciplinary actions, including expulsion, if found in violation of UMCP's sexual misconduct policy. ECF Nos. 54-2 & 54-3. Attached to the letter was a separate "rights and responsibilities" notice, which listed the pertinent procedures and policies under which Doe was being investigated, including UMCP's recently adopted sexual misconduct policy known as "Appendix A." *See* ECF No. 54-3. Appendix A, which took effect in the fall of 2014, details UMCP's procedures for investigating and reviewing a sexual misconduct complaint. *See* ECF No. 54-10.

On February 13, 2015, Doe met with Defendant Josh Bronson ("Bronson"), the Assistant Director of OCRSM. Defendant Catherine Carroll ("Carroll"), OCRSM's director, had appointed Bronson to investigate Roe's complaint. ECF No. 38 at ¶ 14. Bronson interviewed Doe in a "prosecutorial" manner, "repeatedly challeng[ing] or attempt[ing] to contradict the version of events given by [Doe]." *Id.* at ¶ 25. Bronson also told Doe that he viewed his role as akin to that of a prosecutor. *Id.* Bronson did not record the interview, and although Doe provided Bronson with the contact information for K.P. and A.S., "Bronson never contacted the witnesses." *Id.* at ¶ 16. Bronson's final Investigation Report attached to the Amended

3

Complaint, however, notes that Bronson unsuccessfully attempted to contact several witnesses. *Id.* at ¶ 16; *see also* ECF Nos. 43-2 & 54-4.

On April 24, Doe met with Bronson to review his Investigation Report.  ECF No 38 at ¶ 17.  Although Doe was able to review the Investigation Report and take notes, he was not given a physical copy of the report.  Bronson incorporated Doe's comments into the final version of the report submitted to OCRSM.  *Id.*

On May 5, Defendant Goodwin notified Doe via email that his Outcome Conference would take place at 2:00 p.m. the next day.  *Id.* at ¶ 20.  Doe was invited to attend, although his presence was not mandatory.  ECF No. 54-5.  The email further explained that at the Outcome Conference, Doe would receive the final Investigation Report and learn "the outcome of the investigation, any resulting disciplinary charges, and discuss pertinent procedures for final resolution."  ECF No. 38 at ¶ 20.  Doe was reminded that he had the right to retain counsel or seek the assistance of the Undergraduate Student Legal Aid Office.  *Id.*

Doe was also advised to review an attached "Sexual Misconduct Policy and Code of Student Conduct" prior to the meeting.  *Id.* at ¶ 21.  The attached "Sexual Misconduct Policy and Code of Student Conduct," described a UMCP policy that was no longer in effect.  More particularly, the attachment advised that Doe would be entitled to a hearing where he could "pose questions to the other party," and "question witnesses and present evidence."  *Id.*  The old policy also noted that "the burden of proof is on the complainant, who must establish the responsibility of the student charged by a preponderance of the evidence standard."  *Id.*  By contrast, Appendix A eliminated the right to cross examine the complainant and directly question witnesses.  *Id.* at ¶ 23; *see also* ECF No. 54-10.

Shortly after receiving Defendant Goodwin's May 5 email, Doe informed Defendant Goodwin that because of the short notice, he was unable to attend the scheduled Outcome Conference.  ECF No. 38 at ¶ 22.  On May 7, 2015, Doe received a "charging letter" for violation of UMCP's "Sexual Misconduct Policy."  *Id.*; *see also* ECF No. 54-8.  The May 7 letter also included a link to UMCP's operative Sexual Misconduct Policy and "Sexual Misconduct Procedures," including Appendix A.  *Id.* at ¶¶ 22–23.  The charging letter informed Doe that a Standing Review Committee (SRC) meeting was scheduled for Wednesday, May 13 to review his alleged involvement in the December 14 incident.  *Id.* at ¶ 24; *see also* ECF No. 54-8.  The letter further informed Doe that he was welcome to attend the SRC meeting but his presence was not required, and explained that if he attended, Doe could listen to presentation of the final Investigation Report and ask questions of Bronson.  *See* ECF No. 54-8.  Doe was also reminded that Roe's presence was not compelled, and that even if she was present, Doe would not be permitted to ask her questions.  *Id.*; *see also* ECF No. 38 at ¶ 23.  Doe was not told that Goodwin would recommend to the SRC that Doe be expelled.  ECF No. 38 at ¶¶ 30, 69.

Doe requested to postpone the SRC meeting so he could "concentrate wholly on [his] academics," and have more time to prepare for the "trial."  *Id.* at ¶ 24; *see also* ECF No. 54-7.  Goodwin denied the request, noting that the SRC was "not a hearing" and that there was "no process for postponement."  *Id.*; *see also* ECF No. 54-10.

The SRC meeting took place on May 13, during which Doe was given the opportunity to pose questions to Bronson, as well as answer questions posed by SRC members.  ECF No. 38 at ¶ 26; *see also* ECF No. 43-2.  Roe was not present, although the SRC was given the written statements that she had submitted to the police and Bronson.  *See* ECF No. 43-2.  Doe questioned Bronson about Roe's differing written descriptions of the December 14th encounter.  ECF No.

38 at ¶ 26; *see also* ECF Nos. 43-2; 54-8; 54-10.  The SRC also allowed Doe to supplement the

record with affidavits from A.S, K.P., and another individual, M.T., who was at K.P.'s apartment

on December 14.  Each affidavit stated that Bronson had not contacted them regarding his

investigation.  *See id.* at ¶ 26; *see also* ECF Nos. 43-2 & 54-11.

On May 20, 2015, Doe was informed in writing of the SRC's determination that the

December 14 encounter violated UMCP's Sexual Misconduct Policy.  *Id.* at ¶ 27; *see also* ECF

No. 54-12.  The SRC specifically determined that Doe committed sexual misconduct by

engaging in sexual contact with Roe without making a "reasonable attempt to identify himself to

[Roe,] who had no reason to believe the person who began touching her was not the person she

went to bed with."  *Id.* at *¶ 27.*  The SRC recommended Doe's expulsion from UMCP as

sanction for his "gross violation of the sexual misconduct policy" and lack of "mitigating factors

that would warrant a lesser sanction."  *Id.*; *see also* ECF No. 54-12.  In setting forth its findings,

the SRC effectively determined that Roe's version of events prevailed.  ECF No. 54-12.

Doe timely appealed the SRC's determination.  ECF No. 38 at ¶ 28.  Pursuant to UMCP's

Code of Student Conduct, Doe challenged the SRC procedures, articulated new evidence which

he believed was not considered, and highlighted that Defendant Bronson conducted his

investigation in a biased and partisan manner.  *See* ECF No. 54-13.  Doe also noted that Roe had

given conflicting statements about the December 14 events, and particularized those conflicts for

the reviewing board.  *Id.*

Doe's appeal was denied on September 30, 2015.  ECF No. 38 at ¶ 28.  Doe was

informed by Defendant Keira Martone, Assistant Director of Resident Life, that he was expelled

from UMCP, effective immediately.  *Id.*; *see also* ECF No. 54-14.  Because Appendix A

required UMCP's Vice President for Student Affairs, Defendant Linda Clement, and UMCP

President, Defendant Wallace Loh, to approve all expulsions for sexual misconduct, Doe

contacted Loh in a final attempt to avoid expulsion.  ECF No. 38 at ¶ 28.  Loh denied Doe's

request to remain a student.  *Id.*

On September 30, 2016, Doe filed suit in this Court.  ECF No. 1.  On March 30, 2017,

Doe was granted leave to amend his complaint.  ECF No. 38.  Defendants thereafter moved to

dismiss, or in the alternative, for summary judgment, as to all counts.  ECF No. 43.  The issues

were fully briefed and a hearing was held on March 23, 2018.  *See* ECF Nos. 45–55.

**II.     Standard of Review**

The Court treats Defendants' motion as one to dismiss all claims.  When ruling on a

motion to dismiss brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the

court must "accept the well-pled allegations of the complaint as true" and "construe the facts and

reasonable inferences derived therefrom in the light most favorable to the plaintiff."  *Ibarra v.*

*United States*, 120 F.3d 472, 474 (4th Cir. 1997).  The court "may consider any written

instrument attached to the complaint as an exhibit or incorporated in the complaint by reference,

as well as documents upon which the complaint relies and which are integral to the complaint."

*Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005); *see also Philips*

*v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).  Because the Amended

Complaint incorporates attachments for which authenticity is undisputed, the Court will consider

these attachments.  The Court will also consider the transcript of the May 13, 2015 SRC meeting

because the parties do not dispute that it is integral to Doe's Amended Complaint.[3]  Where

appropriate, the Court will credit the contents of attached documents over conflicting allegations

---

[3] Although the transcript was not attached to Doe's Complaint or Amended Complaint, it was attached to
Defendants' motion to dismiss and Doe, in his response to the motion, acknowledged the transcript as "integral to
the Amended Complaint."  ECF No. 45-1 at 7.

in the Amended Complaint.  *See Goines v. Valley Cmty Serv. Bd.*, 822 F.3d 159, 166–67 (4th

Cir. 2016).

### III.    Analysis

#### a.  Eleventh Amendment Immunity

Defendants assert that all claims brought under 42 U.S.C. § 1983 against Defendants in

their official capacities must be dismissed because they are immune from suit pursuant to the

Eleventh Amendment of the United States Constitution.  ECF No. 43-1 at 18–19.  The Eleventh

Amendment prohibits suit against "nonconsenting States . . . in federal court."  *Bd. of Tr. of*

*Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001).  Eleventh Amendment immunity extends to

claims for monetary or retrospective damages against "arms of the State and State officials,"

such as the University of Maryland and its employees.  *Maryland Stadium Authority v. Ellerbe*

*Becket Inc.*, 407 F.3d 255, 262–64 (4th Cir. 2005); *Bickley v. Univ. of Md.*, 527 F. Supp. 174,

181–82 (D. Md. 1981) (citing cases); *see also* Md. Code Ann. § 12-102.

However, under the *Ex Parte Young* exception, the Eleventh Amendment does not bar

federal courts from granting injunctive or other prospective relief.  *See Ex Parte Young*, 209 U.S.

123 (1908).  Doe requests that this Court order UMCP to reinstate him, expunge his record, and

enjoin any "further acts of retaliation or sanctions."  *Id.* at ¶ 139.  Accordingly, the Defendants

cannot claim Eleventh Amendment protection to the extent Doe's claims, if proven, support the

requested injunctive relief.  *See Shepard v. Irving*, 77 F. App'x 615, 620 (4th Cir. 2003) (request

to expunge record is not barred by Eleventh Amendment); *Tigrett v. Rector & Visitors of Univ.*

*of Va.*, 97 F. Supp. 2d 752, 756–57 (4th Cir. 2000); *see also Doe v. Cummins*, 662 F. App'x 437,

444 (6th Cir. 2016) (Eleventh Amendment does not bar expunging record of sexual assault

discipline from university files); *Painter v. Adams*, 2017 WL 4678231, at *3–5 (W.D. N.C. Oct. 17, 2017).

### b.  42 U.S.C. § 1983 Due Process (Count I)

Defendants assert that Doe's due process claim must be dismissed because, according to the Amended Complaint, Doe was accorded sufficient due process.  ECF No. 43-1 at 12–17. Although a public university in the context of disciplinary proceedings must provide the accused notice of the violation and an opportunity to be heard, *Goss v. Lopez*, 419 U.S. 565, 579 (1975), the precise contours of these procedural protections remain "flexible," and may vary as the "particular situation demands."  *Butler v. Rector & Bd. of Visitors of Coll. of William & Mary*, 121 F. App'x 515, 519–20 (4th Cir. 2005) (quoting *Mallette v. Arlington Cty. Employees' Supp. Retirement Sys. II*, 91 F.3d 630, 630 (4th Cir. 1996); *see also Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90 (1978).  Where a student faces possible expulsion or suspension, that student must receive, at a minimum, "advance notice of the charges, a fair opportunity to be heard, and an impartial decision-maker."  *Henson v. Honor Comm. of Univ. of Va.*, 719 F.2d 69, 74 (4th Cir. 1983); *see also Butler*, 121 F. App'x at 519–20.

Even though disciplinary-based expulsions require greater procedural safeguards than academic dismissals, "trial-like" procedures are *not* required to pass constitutional muster. *Butler*, 121 F. App'x at 519 n. 2; *see also Henson*, 719 F.2d at 74.  In assessing the sufficiency of the challenged procedural protections, the Court considers three factors: (1) the nature of the interest protected; (2) the danger of error and the benefit of additional or other procedures; and (3) the burden on the government such procedures would present.  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Butler*, 121 F. App'x at 520.

Doe undoubtedly maintains an important interest in continuing his education at UMCP. ECF No. 38 at ¶¶ 43–44. This Court will presume that UMCP's disciplinary proceedings adversely affected Doe's constitutionally protected property and liberty interests. *See Regents of the Univ. of Mi. v. Ewing*, 474 U.S. 214, 223 (1985); *Tigrett v. Rector & Visitors of Univ. of Va.*, 290 F.3d 620, 627 (4th Cir. 2002); *Henson*, 719 F.2d at 73. Balanced against Doe's particular interests, however, is UMCP's interest in regulating student conduct and maintaining the integrity of its institution. *See, e.g. Butler*, 121 F. App'x at 520. Accordingly, the Court must focus on "the risk of an erroneous deprivation of [Doe's] interest through the procedures used, and probable value, if any, of additional procedural safeguards." *See id.*; *Mathews*, 424 U.S. at 333.

Here, Doe alleges multiple procedural "due process" violations in connection with his expulsion. These violations can be grouped into three discrete challenges: (1) insufficient notice, depriving Doe of a meaningful opportunity to defend himself; (2) lack of a prompt, thorough, and impartial investigation; and (3) no meaningful right to confront or cross examine the accuser. The Court considers each in turn.

### 1. Inadequate Notice

At the March 23 hearing, Doe readily conceded that "notice" was "not his strongest argument," and that quite likely Doe was adequately apprised of the charge pending against him. However, because Doe devotes a substantial portion of his Amended Complaint and written arguments to the purported lack of notice, the Court will reach this issue. *See* ECF Nos. 38 at ¶¶ 30–32, 34–39, 66–67 & 45-1.

Doe maintains that UMCP's notice was inadequate in several ways: (1) the January 29, 2015 notice of sexual misconduct investigation lacked sufficient particularity as to the alleged

misconduct, ECF No. 38 at ¶¶ 13, 30; (2) UMCP failed to provide a physical copy of the applicable policies governing the investigation before Doe's February 13, 2015 interview with Defendant Bronson, *id.* at ¶ 14; (3) UMCP failed to tell Doe in advance of the SRC meeting the recommended sanction or the precise charge against him, *id.* at ¶ 37; (4) Doe was not afforded adequate time to prepare or to hire counsel prior to the SRC meeting, *id.* at ¶ 73; and (5) Defendants gave Doe "conflicting advice" as to what sexual misconduct policy governed the proceedings against him, *id.* at ¶¶ 34–37.

First, as to the written notice provided to Doe in the January 29, 2015 letter, the advisement was constitutionally sufficient. The January 29 letter tells Doe that he is the subject of "an investigation concerning allegations of sexual misconduct that occurred in December 2014, in Frederick Hall." ECF Nos. 38 at ¶ 13 & 54-2. Although Doe takes issue with UMCP's failure to summarize the conduct forming the basis of this allegation because it did not satisfy Appendix A's notice policies, this alone does not support a due process violation. Doe was keenly aware of the incident in question, as he was the subject of a criminal investigation that began the morning of the alleged misconduct. ECF No. 38 at ¶¶ 7–12. Further, Doe does not claim that he was confused about which incident UMCP was investigating. *See id.* at ¶¶ 12–14; *cf. Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 615–16 (E.D. Va. 2016) (finding the notice to plaintiff that the office was "in receipt of a referral for an incident that occurred last semester involving a possible violation of the George Mason University Code of Conduct," was constitutionally deficient, where plaintiff was actually charged for "multiple incidents" spanning a "lengthy period of time."). Notice based on the January 29 letter is sufficient as a matter of law.

Second, as to Defendants' alleged failure to provide Doe with a copy of the Student Code of Conduct or Appendix A, the Amended Complaint demonstrates otherwise.  Doe acknowledges that the January 29 notice of investigation included an attachment summarizing his "rights and responsibilities."  *Id.* at ¶ 13.  In that attachment, Doe was expressly told that the investigation would proceed pursuant to UMCP's Code of Student Conduct and Sexual Misconduct Policies at Appendix A.  *Id.*; *see also* ECF Nos. 54-2 & 54-3.  This particular notice also included a link to the OCRSM website, and Doe does not dispute that the policies could be accessed via that link.  *See* ECF Nos. 54-2 & 54-3; *see also* ECF Nos. 54-5; 54-7; 54-8.  The Amended Complaint, taken as true, demonstrates that Doe was sufficiently informed of the policy governing his proceedings.

Third, Doe's assertion that he was never told of the recommended sanction prior to the SRC meeting, in violation of Appendix A, is a problem of his own making.  ECF No. 38 at ¶ 37. Appendix A makes clear that an accused student will be given an opportunity to meet with a UMCP official who "will share the Investigative Finding, and, as applicable, the recommended sanction," and give the Respondent the "the opportunity to review the full Investigation Report." *Id.* at ¶ 36; *see also* ECF No. 54-10 at 13.  Doe chose not to attend that conference.  *Id.*  at ¶¶ 36– 37; ECF No. 54-7.  Doe was previously informed that expulsion was a potential sanction, and so against this backdrop, Doe's own lack of diligence cannot be laid at UMCP's doorstep as a due process violation.

Fourth, Doe's assertion that he was denied meaningful opportunity to obtain counsel is belied by his Amended Complaint.  At the outset of the investigation, UMCP notified Doe that he could retain counsel or avail himself of the free on-campus student advisor assistance.  *See* ECF No. 38 at ¶ 13; *see also* ECF Nos. 54-3 & 54-10.  Nothing in the Amended Complaint

permits the inference that UMCP deprived Doe of this right, and Doe's failure to obtain counsel is, once again, of his own making, and not attributable to the Defendants' refusal to accord him this procedural protection.

Fifth, Doe's claimed "confusion" arising from the May 5 email, which attached the old sexual misconduct policy, does not amount to a due process violation.  ECF No. 38 at ¶¶ 21–24, 34–35; *see also* ECF Nos. 54-8; 54-9; 54-10.  Doe was informed at the outset of the investigation on January 29 that the new sexual misconduct policy, Appendix A, would govern his proceedings.  *See supra*; *see also* ECF Nos. 54-2 & 54-3.  Defendants also repeatedly provided Doe with the website link where Appendix A could be accessed.  *See* ECF Nos. 54-2; 54-3; 54-8; 54-9; 54-12.  Finally, the investigation proceeded amidst campus wide attention to the substantial changes to UMCP's sexual misconduct policies.  *See* ECF Nos. 33-2 & 33-3.  Doe himself attended at least one training about UMCP's sexual misconduct policies.  ECF No. 43-2 at 35, 48.  Then, on May 7, 2015, six days in advance of the SRC meeting, Doe received a copy of Appendix A.  ECF No. 38 at ¶ 22.  Although Doe argues that a single error in attaching to an email an outdated policy, balanced against UMCP's repeated reference to the correct policy, constitutes a "violation of his due process rights," *id.* at ¶ 37, Doe gives this Court no grounds to demand such perfection from UMCP.  *See id.* at ¶¶ 14–17; *see also* ECF Nos. 54-2; 54-3; 54-8; 54-9; 54-12.

A final word on Doe's notice argument.  At bottom, Doe asserts that the above-described failures rendered Doe unable to defend himself meaningfully during the critical investigative meeting with Bronson on February 13.  This inability to meaningfully defend, says Doe, set him up for failure in all future proceedings that depended so heavily on Bronson's investigation.  But as Doe must acknowledge, his Amended Complaint and the incorporated attachments show that

Doe presented to Bronson all of the arguments and defenses of which he now claims to have been deprived. [4]  *Id.* at ¶ 15; *see Butler*, 121 F. App'x at 520.  Accordingly, none of the alleged procedural deficiencies, taken alone or in combination, amount to constitutionally inadequate notice.

### 2.  *Biased Investigation*

In his Amended Complaint, Doe also complains that his due process rights were violated because he was not afforded an unbiased investigatory process or decision by an unbiased neutral arbiter.  *See* ECF No. 38 at ¶ 76.  Doe more particularly asserts that Bronson investigated Doe's claim in a "prosecutorial manner," failed to contact all pertinent witnesses, and selectively presented evidence to the SRC amounting to a "sham convocation," effectively rendering Bronson both "finder of fact and decision maker."  ECF No. 38 at ¶ 79.

Taking the Amended Complaint and its incorporated attachments as true, Doe has not alleged facts sufficient to infer plausibly that bias eclipsed his due process protections. Bronson's report sets out in detail the witnesses whom he interviewed, the documents he reviewed, and the version of events as described by Roe, Doe, and other witnesses.  *See* ECF No. 54-4.  Bronson then presented his findings to the SRC and was subject to Doe's questioning.  *Id.* & ECF No. 43-2 at 9–11, 14, 18.

Furthermore, the SRC meeting transcript flatly contradicts Doe's allegation that the SRC "considered only evidence as filtered by Bronson."  ECF No. 38 at ¶ 79.  Rather, the SRC allowed Doe to submit affidavits from three witnesses, K.P., M.T., and A.S.  Doe was also

---

[4] During the March 23, 2018 hearing, Doe also argued for the first time that lack of notice rendered Doe unable to challenge Roe's intoxication or the "dare" evidence.  But according to the Amended Complaint, Bronson addressed Roe's intoxication and the "dare" evidence in the Investigation Report, and Doe reviewed this evidence several weeks before the SRC meeting.  ECF No. 38 at ¶ 17 & 54-4.  At the SRC meeting, Doe also presented testimony, answered questions, and submitted affidavits related to the "dare" evidence and Roe's level of intoxication.  *See* ECF No. 43-2 at 9–11, 13, 18, 27–29, 32, 42–43; *see also* ECF No. 54-11.

allowed to testify about the December 14 events, during which Doe specifically addressed the "dare" evidence, his reasons for climbing into K.P.'s bed to sleep with Roe, whether he or Roe were intoxicated, and his basis for believing that Roe had consented to the sexual contact.  *See* ECF No. 43-2 at 27–40.  Doe also delivered an "impact statement" at the SRC meeting wherein he described the personal toll that the investigation had exacted on him.  *Id.* at 41–48 & ECF No. 38 at ¶ 26.  Accordingly, Doe was afforded a constitutionally sufficient investigation and hearing before an independent decision-making body.  *See Butler v. Rector  & Bd. of Visitors of Coll. of William & Mary*, 121 F. App'x 515, 520 (4th Cir. 2005).

### 3.   Right to Confront and Cross-examine Roe

Doe lastly avers that where questions of complainant credibility are central to a university's decision to expel a student, due process demands that the accused be granted the right to confront and cross-examine his accuser.  Doe's argument, however, reads too narrowly the right to confrontation in educational settings.  It is well settled that the accused is not entitled to "trial-like" rights of confrontation or cross-examination at disciplinary proceedings.  *See Henson v. Honor Comm. of Univ. of Va.*, 719 F.2d 69, 73–75 (4th Cir. 1983) (adopting the analysis of *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 159 (5th Cir. 1961)); *Doe v. Alger*, 175 F. Supp. 3d 646, 661 (W.D. Va. 2016); *Butler*, 121 F. App'x at 520 ("[counsel] suggested that a trial-like proceeding, with the attendant right to call and cross-examine witnesses, should have been afforded.  However, we find no basis in the law, nor does [plaintiff] provide one, for importing such a requirement into the academic context."); *see also Tigrett v. Rector & Visitors of Univ. of Va.*, 290 F.3d 620, 629–30 (4th Cir. 2002); *Haley v. Va. Commonwealth Univ.*, 948 F. Supp. 573, 582–83 (E.D. Va. 1996).  This is especially so where, as here, Doe is afforded other mechanisms to challenge the veracity of the accused's recitation of events.  Doe, for example,

15

was permitted to focus the SRC on Roe's inconsistent statements, as well as other circumstantial evidence underscoring why Roe should not be believed. *See* ECF No. 43-2 at 22–25, 27–41; *see also Flaim v. Medical College of Oh.*, 418 F.3d 629, 641 (6th Cir. 2005); *accord Mathews*, 424 U.S. at 335. More generally, Doe gives this Court no reason to upset the settled presumption that the SRC "can and will decide particular controversies conscientiously and fairly." *Boston v. Webb*, 783 F.2d 1163, 1166 (4th Cir. 1986). When balancing UMCP's interests in the integrity of its disciplinary proceedings against Doe's limitation on cross-examining Roe, the limitations imposed in this case do not, as a matter of law, constitute a denial of due process. *See Flaim*, 418 F.3d at 641.

In sum, the Amended Complaint demonstrates that Doe received adequate notice, a meaningful investigatory process, and sufficient opportunity to be heard by an independent decision-making body in connection with his expulsion. Despite Doe's conclusory statements otherwise, UMCP's proceedings taken as a whole satisfy the requirements of due process. *See Henson*, 719 F.2d at 73–75; *Butler*, 121 F. App'x at 520. Doe's due process claim is therefore DISMISSED.

### c. 42 U.S.C. § 1983 Equal Protection (Count II)

To state an equal protection claim, Doe must plead sufficient facts to "demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Williams v. Hansen*, 326 F.3d 569, 576 (4th Cir. 2003); *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *Nofsinger v. Va. Commonwealth Univ.*, 523 F. App'x 204, 205–06 (table) (4th Cir. 2013). Doe asserts that Defendants were "motivated by gender bias" in promulgating a policy that denied due process rights to men accused of sexual misconduct. ECF

No. 38 at ¶¶ 88–94.  Here, Doe's claim is clearly premised on gender discrimination.[5]  However, Doe does not aver any facts supporting a plausible inference that the challenged policy, on its face or as applied to him, treats male respondents differently than female respondents.  Without more, Doe's barebones allegation is not sufficient to withstand challenge.  The claim must be dismissed.[6]

### d.  Title IX Claim (Count IV)

Generally, Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Doe specifically avers that Defendants violated Title IX by conducting a gender-biased investigation, which caused Doe "to be found responsible for a policy violation . . . when he was actually innocent."  ECF No. 38 at ¶ 108.  To sustain what is known as an "erroneous outcome" claim, Doe must plausibly aver: (1) that he was subjected to "a procedurally or otherwise flawed proceeding," (2) which "has led to an adverse and erroneous outcome;" and (3) the "particular circumstances," suggest that "gender bias is the motivating factor behind the erroneous finding." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).  As to the third element, Doe must do more than state in conclusory fashion that the flawed outcome was the result of "gender bias." *Id.*  Rather, Doe must provide some facts, such as "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making," supporting a plausible inference that the proceedings were influenced by gender bias. *Id.*

---

[5] At the March 23, 2018 hearing, Doe's counsel asserted that the equal protection claims are not grounded solely gender discrimination, but also on UMCP's implementing separate procedures for students accused of sexual misconduct as compared to other Code of Conduct violations.  Such allegations are found *nowhere* in the Amended Complaint or attached exhibits.

[6] Defendants also argue that the defense of qualified immunity bars Doe's constitutional claims against Defendants in their individual capacities. Because this Court dismisses the constitutional claims under Federal Rule of Civil Procedure 12(b)(6), it need not reach the qualified immunity question.

As previously discussed, Doe has not plausibly alleged a "procedurally or otherwise flawed proceeding."  *Id.*; *see supra*; *cf. Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 766 (D. Md. 2015).  Rather, Doe was expelled after being afforded sufficient process, including full exercise of his appeal rights.  Alternatively, even assuming that Doe pled demonstrable flaws in UMCP's process, Doe has nonetheless failed to aver any "particular circumstances suggesting that gender bias [was] the motivating factor behind the erroneous finding."  *Yusuf*, 35 F.3d at 715.

Doe attaches to the Amended Complaint a wide array of source materials, claiming that each supports an inference that UMCP's sexual misconduct investigation was infected with gender bias.  *See* ECF Nos. 33-1; 33-2; 33-5; 33-6; 45-6; 52; 54-10.  Doe, for example, avers that UMCP's reaction to the United States Department of Education, Office of Civil Rights' (OCR) 2011 "Dear Colleague" letter, which encouraged universities receiving federal funding to evaluate their sexual misconduct policies, is evidence of UMCP's gender-biased process.  Doe more particularly asserts that the Dear Colleague letter placed undue pressure on universities to prosecute sexual misconduct cases against men or face adverse consequences.  ECF No. 38 at ¶ 107.  In this regard, Doe's allegation of general pressure that the Dear Colleague letter supposedly exerted on *all* universities does not allow the inference that UMCP succumbed to such pressure, and that the pressure rendered a biased outcome in Doe's case.  *See, e.g. Doe v. Lynn Univ. Inc.,* 224 F. Supp. 3d 1288, 1294–95 (D. Fl. 2016); *Naumov v. McDaniel Coll., Inc.*, No. GJH-15-482, 2017 WL 1214406, at *5 (D. Md. Mar. 31, 2017).

Doe attempts to support his "pressure" theory by asserting that after the Dear Colleague letter (1) "virtually all cases" of sexual misconduct at UMCP have involved "female complainants against male respondents;" (2) "communications between UMCP officials" reflect "UMCP's intent to favor female students alleging sexual assault over male students accused;"

and (3) "Defendants['] deliberate indifference to the gender bias and hostile environment exhibited towards the Plaintiff . . . was for the purpose of demonstrating to [OCR] and the public that UMCP was aggressively disciplining male students accused of sexual misconduct."  ECF No. 38 at ¶¶ 99, 106, 107; *see also* ECF No. 45-1 at 29–30.

Deeply troubling, however, is Doe's utter lack of a good faith basis to make such assertions about UMCP.  At the March 23 hearing, Doe's counsel admitted that he, in fact, lifted two of the three averments almost verbatim from a complaint filed in an unrelated case involving an unrelated plaintiff and another university, and was not aware of any facts in this case to support these allegations.  *Compare* ECF No. 38 at ¶¶ 106–07 *with Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 768 (D. Md. 2015).  As to the assertion that "virtually all" complaints at UMCP are lodged by female victims, counsel also admitted that he had no factual basis to support such a sweeping pronouncement.  Doe's conclusory allegations, therefore, will not save his Title IX claim.[7]  *See, Yusuf*, 35 F.3d at 715; *see also Streno v. Shenandoah Univ.*, 278 F. Supp. 3d 924, 930–31 (W.D. Va. 2017); *Doe v. Purdue Univ.*, 281 F. Supp. 3d 754, 775–76 (N.D. In. 2017) (citing cases).

Similarly, Doe's assertion that the UMCP policy itself creates "unreasonable risk of an erroneous outcome for male students that were the subject of sexual misconduct complaints" is not supported by any averred facts.  ECF No. 38 at ¶¶ 51–53; *see also* ECF No. 45-1 at 22–26.  Appendix A is written in a facially neutral manner and applies to *all* students accused of sexual misconduct without regard to gender.  *See generally* ECF Nos. 38 & 54-10.  To the extent Doe points to the new policy as driven by impermissible gender bias, his claim fails because, at base,

---

[7] Doe also provides a November 10, 2014 Diamondback article as evidence of "external pressures" on UMCP to punish men for sexual misconduct.  *See* ECF No. 45-6.  The article almost entirely focuses on the controversy regarding the new definitions of sexual assault, and makes no mention of "pressure" on UMCP to implement new sexual misconduct policies writ large.  Further, the article employs gender neutral terms when discussing sexual misconduct, sexual assault, and the policy changes affecting UMCP.  *See id.*

"sexual-assault victims can be both male and female." *Doe v. Cummins,* 662 F. App'x 437 (6th

Cir. 2016); *see also Haley v. Va. Commonwealth Univ.*, 948 F. Supp. 573, 578–79 (E.D. Va.

1996).

Doe next points to several publications attached to his Amended Complaint which, in his

view, demonstrate that UMCP favors the needs of female sexual assault victims over men

accused of sexual assault. *See* ECF No. 38 at ¶ 104–06. Doe argues that UMCP sponsored-

programming designed to raise awareness regarding violence against women, such as the

"Clothesline Project" and "Take a Walk In Her Shoes," reflect a university-wide gender bias

which can support a plausible inference that UMCP's new sexual misconduct policy is similarly

biased. *Id.* at ¶¶ 48, 104; *see also* ECF No. 33-6. Doe also cites to Defendant Carroll's decade-

old prior professional experience as an advocate for female sexual assault victims as driving her

implementation of gender biased procedures at UMCP.[8]   *See* ECF No. 38 at ¶¶ 47–55, 100,

104; *see also* ECF No. 33-1; *accord Salisbury*, 123 F. Supp. 3d at 766–67.

Doe's argument is fundamentally flawed. Doe does not dispute that female students are

in fact victims of sexual violence. *See generally* ECF Nos. 38 & 45-1. Against this backdrop, it

is not plausible to infer that sponsoring events designed to raise awareness concerning violence

against women means that UMCP is unconcerned with issues affecting men. Likewise, simply

because Carroll, in the past, had taken up the cause of female victims does not render her

hopelessly biased against men as UMCP's Title IX Director. This is especially so where UMCP

---

[8] Doe also argued at the March 23 hearing that Carroll's involvement in training UMCP students to become members of the SRC, as reported in a September 11, 2015 Diamondback article, further demonstrates her gender bias, and sought leave to amend to include this article. Doe more specifically claims that Carroll's use of hypothetical scenarios in the September 11, 2015 article, which referenced female sexual misconduct victims and male perpetrators, underscores her bias against men and reflect a "hostile environment" on campus toward men. *See* ECF Nos. 45-1 at 29–30 & 52; *see also* Hearing Transcript at 41–42. Carroll's examples, considered alone or in combination with the other evidence of claimed bias, do not give rise to the plausible inference that the UMCP sexual misconduct process as applied to Doe led to an erroneous outcome due to gender bias, and any amendment based on ECF No. 52 would be futile. *See Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986); *Haley v. Virginia Com. Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996).

is home to thousands of students with diverse issues of concern, among them female victims of sexual violence. *See, e.g.* ECF Nos. 33-2; 33-3; 45-6. Programming which addresses those interests does not, standing alone, create a plausible inference that UMCP is indifferent or hostile to the needs of the remaining student body. *See, e.g. Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 601–02 (S.D. Oh. 2016); *Doe v. Colgate Univ.*, 15-CV-1069, 2017 WL 4990629, at * 12 (N.D. N.Y. Oct. 31, 2017); *Doe v. Columbia College Chi.*, 17-CV-748, 2017 WL 4804982, at *10 (N.D. Ill. Oct. 25, 2017); *Doe v. Univ. of Chi.*, No. 16-C-08298, 2017 WL 4163960, at *4– *5 (N.D. Ill. Sept. 20, 2017). Accordingly, Doe has failed to aver sufficient facts to demonstrate that the Defendants were motivated by gender bias in proceeding against him for sexual misconduct, and so his Title IX claim is DISMISSED.

At the March 23 hearing, Doe requested that this Court, if inclined to dismiss his federal claims, allow him to file a second amended complaint. The Court declines to allow amendment because the proffered additional evidence, as discussed at the hearing, does not cure his pleading deficiencies. Amendment, therefore, would be futile, and all federal claims are dismissed with prejudice. *See McLean v. United States*, 566 F.3d 391, 400–01 (4th Cir. 2009); *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008); *Weigel v. Maryland*, 950 F. Supp. 2d 811, 825–26 (D. Md. 2013); *see also Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986).

### e.  State Claims (Count IV–VII)

Because the Court has dismissed all federal claims against the Defendants, the Court may in its discretion decline to exercise supplemental jurisdiction over the remaining state claims. *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988). The Court so declines. At this early stage in the proceedings, questions of Maryland constitutional and common law are best resolved

by Maryland courts.  *See Cohill*, 383 U.S. at 350; *Shanagan v. Cahill*, 58 F.3d 106, 110 (4th Cir.

1995).  All state claims are thus DISMISSED without prejudice to refile in state court.

**IV.     Conclusion**

 For the foregoing reasons, Defendants' motion to dismiss, ECF No. 43, is GRANTED.

A separate Order follows.


  3/29/2018             /s/
  Date                Paula Xinis
                    United States District Judge